Judge GLEESON dissents by separate opinion.
CHIN, Circuit Judge:
In this case, plaintiff-appellant James Tepperwien was employed as a security officer by defendant-appellee Entergy Nuclear Operations, Inc. (“Entergy”) at the Indian Point Energy Center (“Indian Point”) in Buchanan, New York. Tepperwien contends that he was sexually harassed by a co-worker, and brought this action below asserting claims for constructive discharge, hostile environment sexual harassment, and retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (“Title VII”).
On Entergy’s motion for summary judgment, the district court dismissed Tepperwien’s constructive discharge claim, but denied the motion as to his hostile environment and retaliation claims. At trial, the jury found for Entergy on the hostile environment claim and for Tepperwien on the retaliation claim. It awarded Tepperwien zero dollars in compensatory and nominal damages and $500,000 in punitive damages. On Entergy’s post-trial motions, pursuant to Fed.R.Civ.P. 50, the district court granted judgment as a matter of law dismissing the retaliation claim. Ruling in the alternative, it vacated the punitive damages award on the grounds the evidence did not support an inference of malice or reckless indifference on the part of Entergy. Finally, the district court held that if Entergy were not entitled to judgment as a matter of law on the retaliation claim, it would grant a new trial pursuant to Rule 59.
Tepperwien appeals from the district court’s rulings. We affirm.

STATEMENT OF THE CASE

*561 A. The Facts[1]
1. Tepperwien’s Employment with Entergy
At all relevant times, Entergy owned and operated two nuclear power plants at Indian Point. Tepperwien first began working at Indian Point as a security officer for Wackenhut Services, Inc., an independent security company, in February 2002. After Entergy took over the operations, Tepperwien was integrated into the Entergy security force in March 2003. He resigned from Entergy in September 2006.
2. The Verbal Harassment
Tepperwien was required, as part of his employment as a security officer, to receive training and to re-qualify annually in the use of firearms. In the spring or summer of 2003, Tepperwien started receiving firearms training from Vito Messina, another Entergy security officer. When Messina was instructing at the firearms range, he was acting as a manager or supervisor. He had the ability to disqualify other officers from using and carrying firearms, and an officer who did not re-qualify was not able to perform many of the functions of a security officer.
Over the course of a one-year period beginning in the summer of 2003, Messina verbally harassed Tepperwien four times. First, in front of other security officers, Messina asked Tepperwien: “Do you think you would ever have sex with a man? Do you think it’s all right?” Tepperwien responded that he could not “explain people” and walked away. Second, the next time Tepperwien went to the range, Messina said to him privately: “I think you and I could be very good friends, very good friends, and we could see each other. And I could take good care of you. And I could even get you [ ] good jobs ... at the plant.” Tepperwien politely left. Third, the next time Tepperwien was at the range, Messina said to him: “[W]hy don’t I excite you? Don’t you-don’t you get excited about me?” Tepperwien responded by saying “I’m ready to shoot,” and proceeded with the drill. Finally, the last time Tepperwien was at the range with Messina, Messina said to a group of twelve officers in Tepperwien’s presence: “[Cjome on, let’s get going, let’s get shooting. Jim Tepperwien is turning me on.”

3.The Buttocks-Grabbing Incident

On November 16, 2004, Tepperwien was in the command post. He was on the telephone with his wife, telling her he was coming home early, when, as he described it, “Messina came out of the armory, shoved against me, put his nails into my buttocks, and then quickly left, bolted away.” Tepperwien tried to stop Messina from leaving, but failed.
Tepperwien reported the incident to his union representative, who in turn reported the incident to an Entergy human resources (“HR”) manager.[2] The HR man *562 ager assigned a senior HR representative, Grace Sanseverino, to investigate. Sanseverino interviewed Tepperwien, Messina, and five others — the Security Superintendent (Terrence Barry, the head of the security department) and four other security officers. Tepperwien told Sanseverino that he was reluctant to report the incident, and she suggested that he do so anonymously. Tepperwien agreed. As a consequence, although she spoke to Messina, she did not confront him directly about Tepperwien’s accusation. She did ask him whether he had ever been involved with touching another person, without indicating male or female, in any inappropriate manner or place. Messina said he had not. Sanseverino also spoke to all security department employees on duty during the shift that day, and no employee reported having witnessed any inappropriate touching or grabbing.
Tepperwien’s complaint against Messina was not sustained, but Barry and HR nonetheless took certain actions. First, all security officers (including Messina) were required to read and sign a memorandum setting forth Entergy’s policy against discrimination, harassment, and retaliation. Second, all 180 security officers were required to attend an all-day training session on diversity, inclusion, and behavior at work. Third, Messina was removed from his position (which had been temporary) as an instructor at the firing range, although this was at least in part a consequence of whether Messina was in the position in violation of union bargaining unit rules.
In December 2004, a few weeks after Tepperwien had complained about the buttocks-grabbing incident, a fact-finding investigation (“fact-finder”) was opened into his use of sick time.[3] He had been out of work for approximately a month apparently as a result of an injury. He used all his remaining sick days and vacation days. About two weeks after he sustained the injury, Tepperwien called the Entergy medical department and stated that he had sustained the injury while participating in a hand-cuffing exercise at work. He had not, however, earlier filled out an accident or incident report and hence Entergy refused to consider this a work-related injury. Entergy conducted a fact-finder into why Tepperwien had used up all his sick time. He was interviewed, and at the conclusion of the investigation, he was issued a letter advising that he would be subject to disciplinary action if he abused his sick time leave in the future.
*563 4. The Hair-Touching Incident
When Tepperwien returned to work, he was able to avoid working with Messina for some months. On August 29, 2005, however, he was assigned to drive Messina to a post, where he would stay and Messina would take over the vehicle. During the ride, they were engaging in “cordial conversation” when, as Tepperwien described it:
Vito started telling me that he found things about me attractive, a number of things; the way I looked, the way I presented myself. And in particular, he liked my hair style. And we’re driving up to the post. And the next thing I knew, he had his hands on my shoulder and going up my neck and into the back of my head.
Tepperwien told Messina not to touch him, and Messina responded “I’m going to touch you as much as I want.” They arrived at their destination and parted.
The next day, Tepperwien reported the incident to the site security superintendent, John Cherubini. Cherubini confronted Messina, and Messina admitted touching Tepperwien’s hair, although he contended he was just removing something from Tepperwien’s hair. Messina also admitted telling Tepperwien he had “nice hair.” Later that day, Messina “was walked off post.” He was put on paid administrative leave pending investigation and was referred (by Barry) for a mandatory psychological evaluation to ensure his fitness for duty.
Messina returned to work on November 9, 2005, after he was found fit for duty. He was issued a “Letter of Discipline,” signed by Barry; this was a written reprimand to be placed in Messina’s personnel file. The letter advised Messina that Entergy expected him to “refrain from any type of inappropriate behavior and conduct in the workplace.” It advised him that “[fjailure to comply with the terms of this reprimand will result in your termination of employment as an Entergy Nuclear Security Officer.”[4]
In November 2005, shortly after Messina returned to work from his administrative leave, Tepperwien met with Barry, a site security supervisor, and union representatives. Barry told Tepperwien that he had wanted to fire Messina, but after consulting with others, he decided to impose a ten-week suspension instead. At one point, Tepperwien said to Barry, facetiously, “Terrence, what are you going to do now? Give me a letter that says I can protect myself? That I can — I can kick Vito in the groin if he comes after me?” Barry responded, “[N]o, no, no. If Vito ever touches you again or anybody ever touches you again, I want you to secure your post and go and tell management and report it.” He added that he thought Tepperwien was being “overemotional” and said “I don’t think I’m going to let you back on site.” Tepperwien responded by denying he was being overemotional and stated that he had every intention of going back on site.
5. Entergy’s Additional Actions With Respect to Tepperwien
On January 7, 2006, Tepperwien was the subject of another fact-finder. A gas mask was discovered missing from a building on *564 Tepperwien’s security route. A fact-finder was conducted to find out why Tepperwien had not reported the mask missing. Tepperwien acknowledged that he had not checked all his assigned equipment when he took over the post, but he explained that it was physically impossible for him to check his equipment at that post, as the equipment was not stored there.
Approximately two weeks later, a counseling letter was issued to Tepperwien confirming that he had been counseled to check and inspect assigned equipment when assuming a post. Another security officer, who held the post the shift before Tepperwien took over, was similarly given a fact-finder and counseling letter for failing to inspect the contingency equipment and failing to notice a gas mask was missing. The other officer accepted his fact-finding and counseling. As discussed below, Tepperwien objected, and his counseling letter was later rescinded.
In late January of 2006, Tepperwien filed a complaint with the Nuclear Regulatory Commission (the “NRC”) regarding the alleged sexual harassment and inappropriate sexual behavior at the Indian Point firing range. On February 2, 2006, Barry asked Tepperwien to attend a meeting on “an NRC regulatory matter for Entergy.” Barry told Tepperwien that his “name had been picked out of a hat,” and even though it was Tepperwien’s day off, he pressed Tepperwien to come in for the meeting.
In fact, the meeting was about the complaint that Tepperwien had filed with the NRC, and Entergy’s outside counsel attended. Tepperwien asked if he could tape-record the meeting. He was told by one of the lawyers no. Tepperwien asked again and was told no again, this time by a supervising attorney, Darryl Shapiro. Tepperwien asked a third time about recording the meeting, and this time Shapiro responded “We don’t have a tape recorder.... If you continue this line, we will request — since you’re not cooperating, we will request that the company immediately terminate you.” Tepperwien asked if he could call his lawyer. He was allowed to do so, and a paralegal from his lawyer’s office was permitted to participate in the meeting by telephone.
In January or February 2006, when Tepperwien was on duty at approximately 7 a.m., another officer came in, about an hour and a half late. Tepperwien stopped him because “there was a tremendous odor coming off of him.” The officer left, returning half an hour later. Tepperwien let him in, and reported to a supervisor a few minutes later that the officer had come in late “reeking.” Tepperwien also told the officer: “I don’t want to get the guy in trouble. He seemed fine. He didn’t slur his words, didn’t trip over his feet.” The officer was later sent home as being unfit for duty. Two other supervisors initiated a fact-finder the same day and asked Tepperwien why he admitted a “drunk” officer into the work site. Tepperwien responded that “[njobody said he was drunk” and advised that he had submitted an incident report. As Tepperwien described it, the fact-finder “pretty much” ended “right then and there.”
In mid-February 2006, Tepperwien met with Barbara Taggart, the coordinator of Entergy’s Employee Concerns Program (“ECP”) at Indian Point, to raise certain concerns. She instructed him to put his concerns in writing, and he did so, on or about February 13, 2006. Tepperwien complained about a number of matters. He complained about the gas mask fact-finder, explaining that he could not have possibly discovered and reported the missing mask upon assuming his post. He complained about the counseling session and counseling letter. He asserted that *565 morale in the security department was “extremely low.” He complained about his meeting with Barry, and how Barry told him his name had been pulled from a hat. He expressed concern about retaliation from management. Although he did not include the matter in his memorandum, Tepperwien told Taggart when he met with her of Messina’s sexual behavior.
On March 6, 2006, Taggart responded to Tepperwien. As for the sexual harassment, Taggart noted that the matter had been investigated and corrective actions taken, including moving the other officer (Messina) off Tepperwien’s shift. As for the actions relating to the missing gas mask, Taggart noted that the counseling session provided to Tepperwien was appropriate at the time based on the known information, as management understood that Tepperwien had not checked his equipment. Based on additional information, however, Taggart noted that management had revisited the issue and was rescinding the counseling letter. As for the meeting with Barry, Taggart acknowledged that the notification for the meeting “was not handled as well as it could have been,” and that action had been taken to address the issue and prevent recurrence.
Tepperwien thereafter completed an ECP “Customer Satisfaction Survey,” and he noted that overall he was “satisfied” with his interactions with ECP and he was “satisfied” with the response to his concerns.
In March 2006, there was an “outage” at Indian Point, during which the reactors were shut down for repair. During outages, additional security is required and consequently shifts are combined. Tepperwien was scheduled to work with Messina the first two days. He complained both days and was switched to another assignment both days. On the third day, Tepperwien spoke to his union representative, who suggested that Tepperwien switch to the night shift. Tepperwien discussed it with his wife. He agreed, in part because he would have every weekend off. He asked to be and was moved to the night shift. After the outage was completed, he “decided to stay on nights a little bit longer.”
Just prior to the outage, Barry conducted a meeting of the “day crew” of the security force as well as several managers. Another security officer asked a question about staffing at a particular gate, and Barry “exploded” and yelled at the officer that he should not be asking such questions. At some point Barry addressed the issue of conflicts, saying: “[T]here are people ... that don’t like each other.” He said: “There are people here I don’t like,” and stared at Tepperwien.
In July or August 2006, Tepperwien was stationed in a “bullet-resistant enclosure” (“BRE”). Once a security officer was inside a BRE, he was not supposed to leave until he was relieved by another officer. At approximately 4 a.m., Tepperwien received a telephone call from a lieutenant who asked Tepperwien to watch a truck that was parked in the yard. The truck was partially in Tepperwien’s view, and he watched it from inside the BRE for about two hours before being relieved by another officer. He told the relief officer of the lieutenant’s order, and suggested that the relief officer call his supervisor to get instructions on whether to continue watching the truck.
A week later, Tepperwien was asked if he had passed on the orders to the officer who relieved him and Tepperwien responded yes. A week after that, Tepperwien was “pulled in for a fact-finder” and asked about the assignment to watch the truck. In particular, he was asked whether he had taken “escort duty” — physical charge — of the truck. The fact-finder end *566 ed, and Tepperwien never received a counseling letter with respect to this incident.
6. Tepperwien Resigns
After the last fact-finder, Tepperwien decided that he no longer wished to be employed at Entergy. He decided to go back to his “old profession” — x-ray technology — and determined that if he found another job, or even “a promise of one,” he would resign from Entergy. On September 3, 2006, he submitted a letter resigning effective two weeks later. Two weeks later he filled out a Form W4 with his new employer.
Before leaving Entergy, Tepperwien filled out a “Separating Employee Survey,” in which he stated that he was leaving for better working conditions, better or more flexible work hours, and personal considerations. He also “agree[d]” that he would consider working for Entergy again and that he had a good working relationship with his supervisor. He “strongly disagree[d]” that his work environment had an atmosphere of teamwork and cooperation. He “agree[d]” that “[ojverall, I was satisfied with my job.”
B. Prior Proceedings
In March 2006, Tepperwien filed a charge of sexual harassment and retaliation against Entergy with the Equal Employment Opportunity Commission (the “EEOC”). Tepperwien received a right to sue letter from the EEOC on October 24, 2006.
■ Tepperwien commenced this action below on January 19, 2007. Tepperwien initially sued additional defendants, including his union and Messina, and asserted claims under federal and state law, but in orders entered June 18, 2007 and July 12, 2007, the district court (Brieant, J.) dismissed all claims except the Title VII claims against Entergy. Tepperwien has not appealed from these orders.
Following discovery, Entergy moved for summary judgment. On March 27, 2009, in a thorough, 30-page decision, the district court (Seibel, J.) granted the motion in part and denied the motion in part. Tepperwien v. Entergy Nuclear Operations, Inc., 606 F.Supp.2d 427 (S.D.N.Y.2009). The district court denied the motion as to Tepperwien’s hostile environment and retaliation claims, but granted the motion dismissing his constructive discharge claim. Tepperwien moved for reconsideration of the dismissal of the constructive discharge claim, and the district court denied the motion. Tepperwien v. Entergy Nuclear Operations, Inc., 606 F.Supp.2d 427 (S.D.N.Y.2009), ECF No. 62.
The case was tried to a jury beginning on July 13, 2009. The jury returned its verdict on July 21, 2009, finding for Entergy on the sexual harassment claim and for Tepperwien on the retaliation claim, and awarding, with respect to retaliation, zero in damages for pain and suffering, $500,000 in punitive damages, and zero in nominal damages.
Entergy moved pursuant to Fed. R.Civ.P. 50 or, alternatively, for a new trial pursuant to Rule 59 or a remittitur with respect to damages. Tepperwien cross-moved for a new trial on his hostile environment claim and to reinstate the constructive discharge claim, which had been dismissed on summary judgment. He separately moved for attorneys’ fees. On March 16, 2010, in a thorough and carefully considered memorandum decision and order, the district court (Seibel, J.) granted Entergy’s motion for judgment as a matter of law as to the retaliation claim and, in the alternative, granted Entergy a new trial on retaliation and vacated the *567 punitive damages award.[5] Tepperwien v. Entergy Nuclear Operations, Inc., No. 07 CV-433 (CS), slip op. at 18 (S.D.N.Y. Mar. 16, 2010), ECF No. 124. The district court granted Entergy’s request to strike Tepperwien’s cross-motion and denied his fee application as moot. Id. at 29. Judgment was entered accordingly, and this appeal followed.

DISCUSSION

On appeal, we review de novo a district court’s grant of a motion for summary judgment pursuant to Rule 56 or a motion for judgment as a matter of law pursuant to Rule 50, applying the same standards applied by the district court. See Advance Pharm., Inc. v. United States, 391 F.3d 377, 390 (2d Cir.2004) (Rule 50); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir.2000) (Rule 56). Summary judgment may be granted only if “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). Judgment as a matter of law may be entered against a party only if “a reasonable jury would not have a legally sufficient basis to find for [a] party on that issue.” Fed.R.Civ.P. 50(a). A Rule 50 motion “ ‘may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury’s findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].’ ” Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir.2008) (quoting Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir.1997) (alterations in original)).
This appeal presents two principal issues: (1) whether the district court erred in granting judgment as a matter of law dismissing the retaliation claim; and (2) whether, alternatively, the district court erred in vacating the punitive damages award with respect to the retaliation claim. We address the two issues in turn.
A. Retaliation
Title VII contains an antiretaliation provision, which makes it unlawful for an employer to discriminate against an employee for opposing any practice made unlawful by Title VII. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59-60, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Hicks v. Baines, 593 F.3d 159, 164 (2d Cir.2010); see 42 U.S.C. § 2000e-3(a). The provision seeks to further Title VII’s goal of a workplace free from discrimination on the basis of race, ethnicity, religion, or gender “by preventing an employer from interfering (through retaliation) with an employee’s efforts to secure or advance enforcement of [Title VII]’s basic guarantees.” Burlington, 548 U.S. at 63, 126 S.Ct. 2405. Title VII thus prohibits an employer from taking “materially adverse” action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity. Id. at 56, 59, 126 S.Ct. 2405; see also Thompson v. N. Am. Stainless, LP, — U.S. —, —, 131 S.Ct. 863, 868, 178 L.Ed.2d 694 (2011) (“Title VII’s antiretaliation provision must *568 be construed to cover a broad range of employer conduct.”).[6]
Here, the principal question presented is whether the purportedly retaliatory actions taken by Entergy against Tepperwien were “materially adverse.” The district court granted judgment as a matter of law in favor of Entergy on the basis that the actions were not, as a matter of law, materially adverse.
In Burlington, the Supreme Court explained that Title VII’s antiretaliation provision covers only an employer’s actions that are “materially adverse”:
The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.... In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, “which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.”
Burlington, 548 U.S. at 67-68, 126 S.Ct. 2405 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.Cir.2006)). Actions that are “trivial harms” — i.e., “those petty slights or minor annoyances that often take place at work and that all employees experience” — are not materially adverse. Burlington, 548 U.S. at 68, 126 S.Ct. 2405; accord Hicks, 593 F.3d at 165. As the Court reminded us in Burlington, Title VII does not set forth “ ‘a general civility code for the American workplace.’ ” 548 U.S. at 68, 126 S.Ct. 2405 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).
Material adversity is to be determined objectively, based on the reactions of a reasonable employee. Id. at 69-70, 126 S.Ct. 2405. “Context matters,” as some actions may take on more or less significance depending on the context. Id. at 69, 126 S.Ct. 2405. Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct. Hicks, 593 F.3d at 165.
In his brief on appeal, Tepperwien contends that he was subject to at least nine acts of retaliation by Entergy: (1) three fact-finding sessions; (2) a counseling; (3) Barry’s threat of termination; (4) Shapiro’s threat of termination; (5) Barry’s comments and stare during the employee meeting; (6) Barry’s falsifying of the reason for bringing Tepperwien in on his day off; and (7) being forced to switch from a day shift to the night shift. We agree with the district court that no reasonable jury could have found that these actions, taken as described by Tepperwien and considered both individually and in the aggregate, were materially adverse.
1. The Fact-Finders
Tepperwien contends that three fact-finders were retaliatory: (a) January 2006, *569 regarding the missing gas mask; (b) January or February of 2006, regarding Tepperwien’s letting an apparently drunk security officer onto the work site; and (c) July or August 2006, regarding Tepperwien’s carrying out of orders to watch a truck while he was in the BRE.[7] The district court correctly held that the three fact-finders were not materially adverse as .a matter of law.
First, fact-finders at Entergy were not disciplinary in nature. They fell outside of Entergy’s four levels of discipline and could not be grieved by the union. They were common occurrences at Entergy, as the shop steward testified that he reviewed thirty fact-finders a week. They were triggered when there was a reason to investigate, e.g., to determine whether corrective action should be taken. Indeed, Tepperwien acknowledged that in “most situations, fact-finders are there to be helpful, get everybody in a room and see if some other action has to proceed after that.”
Second, there was good reason for Entergy to initiate these fact-finders, and thus no reasonable employee would have found them to be materially adverse or stigmatizing. In the first, a gas mask was discovered missing on Tepperwien’s assigned route; another security officer was subjected to a fact-finder for the missing gas mask as well. In the second, Tepperwien permitted a security officer to pass through a security checkpoint and enter the work place; the officer was apparently intoxicated and was later sent home as unfit for duty. In the third, while Tepperwien was on watch, an unidentified truck was permitted to remain in the yard— outside a nuclear power plant — -for at least two hours. Even assuming Tepperwien acted perfectly appropriately in all three incidents, there certainly was good reason for Entergy management to at least look into these situations.
Third, while fact-finders certainly could lead to disciplinary action, they did not here. Although a counseling letter was issued with respect to the gas mask incident, it was later rescinded. In fact, Tepperwien never complained to the ECP or his union about the fact-finders because, as he acknowledged, “[tjhere was no reason to, because they all died. They didn’t go anywhere.” (Tr. at 224-25)/ He admitted that none of the fact-finders resulted in any discipline.
Finally, Tepperwien argues that he had not been subject to a fact-finding for the three years prior to his filing of his various complaints. The testimony cited for this proposition, however, is equivocal,[8] but even assuming that Tepperwien was not subjected to any fact-finders until after he complained of sexual harassment, this is proof only of causation and a retaliatory motive — not of materiality. Again, Title VII does not protect an employee from “all retaliation,” but only “retaliation that produces an injury or harm.” Burlington, 548 U.S. at 67, 126 S.Ct. 2405; see Hicks, 593 F.3d at 164-65. Even assuming they were causally connected to Tepperwien’s protected activity, the three fact-finders— *570 occurring over the course of approximately eight months, consisting only of brief inquiries, and resulting in no discipline— were merely “trivial harms” or “petty slights or minor annoyances.” Burlington, 548 U.S. at 68, 126 S.Ct. 2405.
2. The Counseling
Tepperwien argues that the counseling he received with respect to the missing gas mask was a material adverse action. We agree with the district court that it was not as a matter of law.
First, the counseling was rescinded after Tepperwien contacted the ECP. See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir.2006) (holding that change in employee’s reporting structure was not adverse employment action where it was rescinded with an apology day after employee complained); Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 756 (2d Cir.2004) (holding that jury could reasonably find that negative performance evaluation did not constitute material adverse action, where it was rescinded and destroyed two weeks after it was issued); cf. Nagle v. Vill. of Calumet Park, 554 F.3d 1106, 1120-21 (7th Cir.2009) (holding that no adverse action occurred where plaintiff never served suspension). While we do not hold that rescinded discipline can never constitute materially adverse action, we do hold that in the circumstances here, the rescinded counseling letter was not a material adverse employment action.
Second, as Tepperwien acknowledged, the counseling did not place him in an active disciplinary process. The form itself is titled “Employee Discussion Guide,” and it confirmed that Tepperwien was not in an active “stepwise” disciplinary process. It noted only that the discussion was intended to be a “counseling” rather than a suspension, verbal warning, letter of reprimand, or “other” discipline. Hence, the form itself makes clear that a counseling is below even a warning or reprimand. The counseling was merely a discussion of a legitimate safety concern — a missing piece of safety equipment and Tepperwien’s actions in connection therewith.
Third, even assuming the counseling rose to the level of some form of criticism, we have held, in the context of the issuance of a “counseling memo,” that “criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.” Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir.2001), abrogated on other grounds by Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).[9]
Finally, the lack of material adversity is also demonstrated by the fact that Tepperwien was not the only officer to be counseled for this issue. Another security officer was counseled for the same failure to check the equipment, and the shop steward testified that this “was an issue that had come up before, not just with Mr. Tepperwien,” and the problem was “a system error, not a behavior issue.” The focus here clearly was not on Tepperwien, and it was not likely that counseling of this nature, which was given to other employ *571 ees as well, would deter a reasonable employee from complaining of discrimination.
In light of all the circumstances, we agree with the district court that no reasonable factfinder could have concluded that the withdrawn counseling was “the sort of action that would have dissuaded a reasonable employee in [Tepperwien’s] position from complaining of unlawful discrimination.” [10]
3. The Remaining Actions
The remaining actions of which Tepperwien complains fall into the category of “trivial harms” and “petty slights or minor annoyances.” Barry’s purported threat to walk Tepperwien off site was made after Tepperwien facetiously asked whether he could “kick Vito in the groin.” The “threat,” which was made in the course of a heated conversation, was never carried out. Shapiro’s purported “threat of termination” was made after Tepperwien asked not once, not twice, but three times to tape record the meeting. This “threat” likewise was never carried out, and Tepperwien was allowed to call his lawyer, and someone from the lawyer’s office was permitted to participate in the meeting by telephone. See Vazquez v. Southside United Hous. Dev. Fund Corp., No. 06-CV-5997 (NGG)(LB), 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009) (“Courts interpreting Burlington Northern have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions.”).
Barry’s comment and stare during the employee meeting are not materially adverse actions. See Burlington, 548 U.S. at 68, 126 S.Ct. 2405 (“ ‘[Personality conflicts at work that generate antipathy and snubbing by supervisors and coworkers are not actionable.’” (quoting 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 669 (3d ed.1996))); Martinez v. N.Y.C. Dep’t of Educ., No. 04-CIV-2728 (LTS)(DFE), 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008) (“[Incidents where [supervisor] publicly yelled at [plaintiff] for various reasons or called him ‘shit’ ... constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable.”). Barry’s use of a false reason to bring Tepperwien in for a meeting to discuss his complaint to the NRC — a meeting that Tepperwien surely would have wanted to attend anyway — was hardly the kind of action that would dissuade a reasonable employee from complaining. Even assuming Barry’s motive was retaliatory, the method by which he summoned Tepperwien to the meeting was not in itself a material adverse action.
Finally, the switch to the night shift was not materially adverse because, as his own testimony makes clear, Tepperwien requested it. During the outage, the day shifts were combined, and as a consequence Tepperwien was scheduled to work with Messina. Tepperwien met with O’Hara, the union shop steward, to complain, and O’Hara suggested switching to *572 nights. After speaking with his wife, Tepperwien agreed to make the request, in part because he would have every weekend off. Tepperwien told O’Hara that he would take the shift change, O’Hara made the request to Barry, and Barry granted it. Even after the outage ended, Tepperwien “decided to stay on nights.” Hence, the record shows clearly that Tepperwien asked to be moved to the night shift, and there is nothing in the record to suggest that he ever objected to working nights or that he ever asked to be moved back to the day shift.
4. The Actions in the Aggregate
While the actions fail individually to provide a basis for a reasonable jury to conclude that Tepperwien was subjected to material adverse employment actions, they also fail in the aggregate. Individually the actions were trivial, and placed in context they remain trivial. Taken in the aggregate, the actions still did not adversely affect Tepperwien in any material way. “Zero plus zero is zero.” MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir.1998); cf. Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 763 (7th Cir.2001) (“And it is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevances will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.”).
The context is also significant. The security unit at Indian Point was akin to a law enforcement or quasi-military unit, with a chain of command, lieutenants and chiefs, handcuffing exercises, the deployment of weapons, and the use of BREs. The task of securing a nuclear power plant raised significant safety concerns not found in most work environments, and, understandably, there was little tolerance for mistakes and rule violations, or even perceived mistakes. It is not surprising that Tepperwien was treated in a rough and tumble manner rather than with kid gloves or in a genteel fashion. See Hicks, 593 F.3d at 165 (noting that “ ‘context matters’ ” when evaluating whether a action is “materially adverse” (quoting Burlington Northern, 548 U.S. at 69, 126 S.Ct. 2405)).
Viewing all of the actions in the aggregate, we conclude that a reasonable employee in Tepperwien’s situation would not have been deterred from engaging in protected activities. Indeed, while the test is an objective one, it is relevant that Tepperwien himself was not deterred from complaining — he complained numerous times. Moreover, Tepperwien acknowledged, after all the incidents and when it was clear that he was leaving Entergy, that he would consider working for Entergy again and that overall he was satisfied with his job at Entergy.
Accordingly, we hold that the district court properly granted Entergy’s motion for judgment as a matter of law dismissing the retaliation claim.
B. Punitive Damages
Our decision above obviates the need to reach the punitive damages claim. Nonetheless, we discuss the claim because punitive damages were the only damages awarded by the jury, and Tepperwien’s lack of entitlement to punitive damages is clear.
Punitive damages are available under Title VII where an employer discriminates or retaliates against an employee with “malice” or “reckless indifference” to the employee’s federally protected rights. Kolstad v. Am. Dental Ass’n, 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting 42 U.S.C. § 1981a(b)(l)); see Farias v. Instructional *573 Sys., Inc., 259 F.3d 91, 101-02 (2d Cir. 2001). A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against him with “conscious knowledge it was violating the law,” or that it engaged in “ ‘egregious’ or ‘outrageous’ conduct from which an inference of malice or reckless indifference could be drawn.” Farias, 259 F.3d at 102.
Even where a plaintiff establishes malice or reckless indifference, a corporate defendant may still avail itself of an affirmative defense. An employer can avoid liability for punitive damages by showing that it “[1] had an antidiscrimination policy and [2] made a good faith effort to enforce it.” Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 385 (2d Cir.2001). In Kolstad, the Supreme Court made clear that, “in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer’s ‘good-faith efforts to comply with Title VII.’” 527 U.S. at 545, 119 S.Ct. 2118 (quoting Kolstad v. Am. Dental Ass’n, 139 F.3d 958, 974 (D.C.Cir.1998) (Tatel, J., dissenting)).
The jury’s award of $500,000 in punitive damages on Tepperwien’s retaliation claim was wholly without basis. Tepperwien presented little if any evidence of malice or reckless indifference or egregious or outrageous behavior on the part of Entergy. He relies principally on Barry’s conduct, including Barry’s actions and statements discussed above. But for the same reasons that we conclude that this conduct was not materially adverse, we conclude, as a matter of law, that this conduct was not a sufficient basis for an award of punitive damages. While Barry surely could have treated Tepperwien more delicately, his conduct did not evince a reckless disregard for Tepperwien’s federally-protected rights. To the contrary, Barry was very much a part of Entergy’s effort, as'discussed below, to address Tepperwien’s concerns.
As the district court concluded, and as a reasonable jury could only so find, Entergy made a good-faith effort to comply with its obligations under Title VII. It had an antidiscrimination and antiretaliation policy. All its employees, including management employees, received training on its anti-harassment policy. It provided its employees with numerous avenues to report instances of discrimination or retaliation or harassment.
When Tepperwien complained to HR in November 2004 of physical abuse by Messina, Entergy investigated the matter carefully, and even though the charge was not sustained, Entergy took concrete action: distributing a department-wide memo (signed by Barry) reminding employees of the company’s expectations regarding workplace behavior; requiring all security department employees to attend training; and removing Messina as range instructor. When Tepperwien complained to his supervisor in August 2005 that Messina had touched his hair inappropriately, Entergy investigated swiftly, and Messina was walked off-site and placed on administrative leave (albeit paid) the same day. Messina was sent for psychological evaluation (by Barry) before he was reinstated, and when he was reinstated, a written reprimand was placed in his personnel file.[11]
When Tepperwien filed a complaint with the NRC in January 2006, Entergy management convened a meeting to discuss his *574 concerns; Tepperwien was permitted to have a representative from his lawyer’s office participate in the meeting by telephone. And when Tepperwien complained to the ECP in February 2006, Taggart met with him, listened to his concerns, investigated, and responded in writing. The counseling letter was rescinded. Tepperwien noted afterwards that he was “satisfied” with his interactions with ECP and with the response to the concerns he had raised. Tepperwien asked to be moved to the night shift so that he could avoid Messina, and Entergy — with Barry making the decision- — agreed.
Far from acting maliciously or indifferently or egregiously, the evidence showed, and a reasonable jury could only find, that Entergy sought to, and did, address Tepperwien’s complaints in good faith. It gave him an opportunity to be heard, it listened to his concerns, and it took concrete steps to address them. The district court correctly held that, even assuming the jury could have reasonably found for Tepperwien on his retaliation claim, Entergy was entitled to judgment as a matter of law on the award of punitive damages.

CONCLUSION

We have considered Tepperwien’s remaining arguments and reject them as being without merit.
For the reasons set forth above, the judgment of the district court is affirmed in all respects.

. The facts are drawn primarily from the trial record. “When an appeal comes to us after a jury verdict, we view the facts of the case in the light most favorable to the prevailing party.” See Kosmynka v. Polaris Indus., 462 F.3d 74, 77 (2d Cir.2006). Here, although Entergy was the prevailing party with respect to the hostile environment claim and the claim for compensatory damages for retaliation, as a matter of convenience, we view all the evidence in the light most favorable to Tepperwien.

. Entergy had a harassment prevention policy that prohibited harassment in the workplace and required all employees to report any instances of harassment. Pursuant to the policy, all Entergy employees, including managers, received training regarding the harassment prevention policy. Employees could report violations to: (1) a supervisor or manager; (2) HR; (3) the Employee Con *562 cerns office; (4) the on-line reporting system; (5) the ethics hotline; and (6) the union (for bargaining-unit employees).

. At trial, Tepperwien described his understanding of a "fact-finder” at Entergy:
A fact-finding is a document. You usually go to a fact-finding with management and with your union rep. And the fact-finder is pretty much: Did something happen? Was it good? Was it bad? Can we ... find out if we should be doing something differently? Shall we correct the situation or policy?
Under most situations, fact-finders are there to be helpful, get everybody in a room and see if some other action has to proceed after that.
Patrick O’Hara, the chief shop steward of Tepperwien’s union, who was called as a witness by Tepperwien, explained that "when things happen, the company conducts a fact finding. There’s a union representative there. There’s a management representative there. They ask questions.” A fact-finder is a process by which "the company investigates various issues.” O’Hara would review "about 30 fact findings ... a week.” Fact-finders are not disciplinary in nature and cannot be grieved by the union, and they do not fall within Entergy’s four levels of discipline (verbal warning, written reprimand, suspension, and termination). Depending on the findings, a fact-finder could lead to disciplinary action.

. O’Hara, the chief shop steward, testified that if Entergy had sought to terminate Messina's employment on November 9, 2005, the union “clearly” would have filed a grievance because "the only thing that we ... knew for sure was that Mr. Messina had touched Mr. Tepperwien’s hair.... [I]f the company was going to terminate Mr. Messina for touching another employee’s hair, surely an arbitrator would overturn that. We were very confident. And I think the company knew that.”

. We note that during trial the district court expressed some reluctance as to whether it should submit the punitive damages claim to the jury, stating: "On the one hand, I don’t see how a jury could possibly come back with punitive damages in this case, and that probably means I shouldn't let it go to them.” In the end, the district court took the more cautious approach, submitting the claim to the jury, but noting that she would revisit the issue if the jury were to award punitive damages.

. Retaliation claims under Title VII are generally analyzed under a modified version of the McDonnell Douglas test. First, the plaintiff must establish a prima facie case of retaliation by showing: (1) his participation in protected activity; (2) defendant’s knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Second, if the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action. Third, if the employer does so, then the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action. Hides, 593 F.3d at 164 — 65 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); see also Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir.2005). We need not engage in the full analysis here, as we focus on the third element.

. The record contains evidence relating to a fourth fact-finder: the December 2004 fact-finder relating to Tepperwien’s use of sick leave. On appeal, Tepperwien complains only of three fact-finders, although he does not specify which ones. At trial, however, he did not argue that this earlier fact-finder was retaliatory in nature.

. Tepperwien testified that ”[t]he only other fact-finders I can tell you about had to do with letters that I received stating that I had violated or had abused company sick time policy. That’s all I can remember.” His counsel then immediately tried to refresh his recollection about other apparent fact-finders.

. Accord Perez v. N.Y. & Presbyterian Hosp., No. 05 Civ. 5749(LBS), 2009 WL 3634038, at *15 (S.D.N.Y. Nov. 3, 2009) (holding that disciplinary reprimand that did not alter job responsibilities or otherwise affect employment was not sufficiently material to constitute adverse employment action)', Potenza v. W. Irondequoit Cent. Sch. Dist., No. 06-CV-6407, 2009 WL 2876204, at *8 (W.D.N.Y. Sept. 2, 2009) (where job counseling did not result in any diminution of pay, status, or benefits, it was not adverse employment action).

. At the summary judgment stage, the district court concluded that the plaintiff had "presented evidence sufficient to create a triable issue as to whether the counseling was retaliatory." Tepperwien v. Entergy Nuclear Operations, Inc., 606 F.Supp.2d 427, 445 (S.D.N.Y.2009). Although there is some tension between this conclusion and the district court's decision to grant Entergy’s Rule 50 motion on retaliation, as the district court noted in its Rule 50 opinion, the “evidence at trial suggesting the counseling amounted to an adverse employment action offered a substantially weaker picture than that presented at the summary judgment stage.” Tepperwien v. Entergy Nuclear Operations, Inc., No. 07 CV-433 (CS), slip op. at 10 (S.D.N.Y. Mar. 16, 2010), ECFNo. 124.

. Entergy also recommended that Messina seek counseling. It appears that he never did, but Entergy did not follow up.