**12-1526-cv**
**Cox v. Onondaga Cnty. Sheriff's Dep't.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: February 20, 2013          Decided: July 23, 2014)

Docket No. 12-1526-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEVEN COX, THOMAS BINGHAM, EDWARD KALIN, MICHAEL McCARTY, and ROBERT SCOTT FELDMAN,

Plaintiffs-Appellants,

v.

ONONDAGA COUNTY SHERIFF'S DEPARTMENT; KEVIN E. WALSH, in his individual and official capacity; JOHN WOLOSZYN, in his individual and official capacity; DEPUTY SHERIFF O'DELL WILLIS, in his individual and official capacity; ONONDAGA COUNTY; NICHOLAS PIRRO, ONONDAGA COUNTY EXECUTIVE; JOANNIE MAHONEY, ONONDAGA COUNTY EXECUTIVE,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, CHIN, and DRONEY, Circuit Judges.

Appeal from grant of summary judgment by the United States District Court for the Northern District of New York (Norman A. Mordue, Judge) dismissing appellants' Title VII retaliation claims. We hold that the employer's investigation into appellants' claims of racial harassment was not an adverse employment action. We also hold that while appellants have established a prima facie case of retaliation based on threats

of discipline against appellants for filing a false report with the EEOC, the employer has demonstrated a non-retaliatory purpose as a matter of law.  We therefore affirm.

> A.J. BOSMAN, Bosman Law Firm, LLC, Rome, NY, for Plaintiffs-Appellants.
>
> CAROL L. RHINEHART, Onondaga County Department of Law, Syracuse, NY, for Defendants-Appellees Onondaga County Sheriff's Department, Kevin E. Walsh, O'Dell Willis, Onondaga County, Nicholas Pirro, and Joannie Mahoney. LAURA L. SPRING, Sugarman Law Firm, LLP, Syracuse, NY, for Defendant-Appellee John Woloszyn.

WINTER, Circuit Judge:

Onondaga County Sheriff's Department ("Department") Deputies Steven Cox, Thomas Bingham, Edward Kalin, Michael McCarty, and Robert Scott Feldman appeal from Judge Mordue's granting of summary judgment dismissing their complaint.  That complaint asserted retaliation for their complaints of racial harassment to the Equal Opportunity Employment Commission ("EEOC"), in violation of Title VII, 42 U.S.C. § 2000e-3.

We hold that the Department's initiation and conduct of an investigation into:  (i) the white appellants' claims of racial harassment alleged to have been generated by an African American officer, and (ii) a complaint against appellants for filing false reports with the EEOC of such harassment, were not adverse employment actions.  We also hold that threats by the Department

2

to charge appellants with making a false report to the EEOC established a prima facie case of illegal retaliation but that the Department has shown a non-retaliatory purpose, and appellants have presented no evidence of pretext.

BACKGROUND

On review of a grant of summary judgment dismissing a complaint, we view the record in the light most favorable to appellants. Gallo v. Prudential Resid. Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

The present dispute began when appellants Cox, McCarty, Feldman, and Bingham, as well as a lieutenant, non-appellant Jim Raus, shaved their heads to demonstrate solidarity with appellant Kalin, a cancer patient who lost his hair as a result of chemotherapy treatments. All were employed as "transport/custody officers" in the Onondaga County Sheriff's Department. On August 26, 2005, appellants and Raus filed what is known as a "blue form" complaint, initiating an internal departmental procedure, alleging racial harassment. A blue form complaint usually results only in an informal investigation and not in a full investigation by the Department's internal investigation arm, the Professional Standards Unit ("PSU").

In the blue form complaint, the deputies and lieutenant stated that they had been the victims of rumors, based on their shaved heads, that they were "skinheads" -- i.e. members of a

white-supremacist group. The complaint alleged that "rumors and the talk in the Custody Division [was then] that [the deputies and Lieutenant Raus were] members of a skin head organization."

It also stated that "this vicious labeling of [the deputies and lieutenant] was apparently started by a[n] African American Deputy, who work[ed] with [them] in the Transport Unit." Specifically, the blue form complaint alleged that an African American Deputy, O'Dell Willis, had approached Cox and questioned him about why his head was shaven. It further alleged that shortly thereafter, other, unnamed African American Deputies approached Cox, Feldman, and McCarty and questioned them about their shaved heads. None of the inquiries, whether by Willis or by the unnamed deputies, was alleged to have been accusatory or confrontational. Finally, the complaint alleged the complainants' belief that the rumors had made the workplace "racially hostile and unsafe" and in addition, "put [their] families, wives and children in danger." It appears from developments described infra that while Department employees had asked about why appellants' heads were shaved and perhaps mentioned the existence of the rumors, the accusatory harassment was by inmates.

The Department's Assistant Chief Wasilewski instructed former Captain Woloszyn to investigate the complainants' allegations. Woloszyn's investigation concluded with a report

4

dated October 21, 2005, that found no evidence of harassment. According to Woloszyn's report, certain deputies had inquired, but not in a hostile way, why the deputies had shaved their heads. According to Woloszyn's report, none of the appellants had heard Department members directly accuse them of being skinheads. Rather, they had heard only from others that such comments had been made. However, after being interviewed by Woloszyn, Lieutenant Raus withdrew as a complainant because he "was not approached by anyone and did not feel harassed but was misled [by Cox] into believing" that harassing conduct had occurred.

The Woloszyn report settled little. The subsequent PSU investigation, discussed infra, revealed that while Woloszyn's conclusions about the lack of first-hand testimony about accusatory behavior was correct so far as it went, he may not have actually interviewed appellants McCarty or Bingham, or several other deputies, whom he claimed to have interviewed. Nevertheless, with the assistance of then-Union president Deputy Dan Mathews and a union attorney, the five appellants filed individual racial harassment complaints with the EEOC between September 29 and October 12, 2005.

Appellants' EEOC complaints, which were under oath, differed materially from their blue form complaint. Instead of alleging, as they did in the blue form complaint, a non-hostile encounter

in which Willis simply asked Cox why his head was shaven, Cox and McCarty stated to the EEOC that an unnamed African American Deputy had accused them of being skinheads in a face to face confrontation.  On this record, the reference to an African American Deputy has to be understood to be Willis.  Willis is the only African American Deputy mentioned by name in the blue form complaint, which strongly implies -- all but expressly states -- that Willis is the source of the allegedly harassing rumors.  The PSU investigation, described infra, collected testimony that Willis was believed by all to be the source.  The complaint in the present matter named Willis as a defendant and directly alleged that the hostile environment was "fanned by the actions of Defendant Willis."  On this record, the reference to an unnamed African American Deputy would have been understood, then and now, to mean Willis.  Finally, statements by Cox, McCarty and Feldman indicated prior, hostile, but unrelated, encounters with Willis.  Nothing in appellants' brief claims that anyone but Willis was believed to be the source of the alleged harassment.

Feldman and Bingham also complained that they had heard from other deputies that they had been referred to as skinheads and called racist by African American Deputies.  Kalin's complaint stated that he had been confronted with the existence of rumors that he was a skinhead.  Every appellant complained that the Department had acted upon similar complaints of harassment by

African American Deputies but failed to act upon theirs.

On October 26, 2005, the Department filed a response with the EEOC, signed by Assistant Chief Wasilewski. The response stated that Wasilewski could find no merit to the harassment alleged in either the blue form or the EEOC complaint filed by appellants. It also stated that "the employer has made every effort to determine if any harassment has occurred in this incident. In furtherance of that end, I have submitted this entire package to the Onondaga County Sheriff's Office Professional Standards Unit, our internal investigation arm, for their review, recommendation, and interdiction." The submission to the PSU was pursuant to a written Onondaga policy that harassment complaints were to be investigated by the PSU at the Department Chief's direction.

On December 12, 2005, the EEOC dismissed all appellants' complaints and issued a notice to appellants of their right to sue within 90 days. However, appellants never pursued the harassment claim further.

The PSU continued with its investigation. When it commenced, it had before it: (i) the original blue form complaint; (ii) the individual EEOC complaints; (iii) Lieutenant Raus's written withdrawal of his blue form complaint; (iv) the October 21, 2005 report of Captain Woloszyn; and (v) the October 26, 2005 statement to the EEOC. Also before the PSU was a

misconduct allegation by Assistant Chief Wasilewski that he forwarded to the PSU on November 11, 2005. He alleged that Cox, McCarty, Feldman, Bingham, Kalin, and Lieutenant Raus violated Departmental regulations by filing false reports.[1] This allegation was presumably based on the inconsistent factual claims asserted in the blue form complaint and EEOC filings. Wasilewski's misconduct complaint also accused Woloszyn of false statements, presumably for claiming non-existent interviews in his report.

The PSU thus had before it a variety of issues: (i) whether appellants had been racially harassed because of rumors started by Willis that they were skinheads; (ii) whether appellants' complaints of racial harassment generated by Willis were knowingly false; and (iii) whether Woloszyn had made a false report regarding his investigation into (i).

The issues were yet more complicated. The misconduct complaint in (ii), if upheld, would support an inference that several white officers had engaged in a coordinated effort to harass Willis, who had earlier prevailed in a Title VII lawsuit against the Department alleging a hostile work environment and

---

[1] The misconduct complaint was based on Sections 2.8 and 4.3 of the Department's policy and procedures. Section 2.8 provides, "[m]embers shall refrain from actions or conduct while on duty which may discredit a member or the Sheriff's Office." Section 4.3 provides, "[m]embers shall not make or submit a report or document, which contains information known by the member to be inaccurate, false or improper . . . nor influence another person to do so."

retaliation.  See Willis v. Onondaga County Sheriff's Department, No. 5:04-cv-00828 (GTS-GHL), Dkt. No. 67-68, 77.  The existence of racial tension in the Department at pertinent times is evident from the record, as is the belief of appellants that their grievances were treated less sympathetically than those of African American officers, particularly Willis.

In that context, Sergeant Smith began the PSU investigation.  Smith interviewed the appellants individually, in the presence of a union representative.  None of them, including McCarty and Cox, claimed to have been called a skinhead to their face by another deputy.  Appellants, and most of the other officers in the Department who were interviewed, reported the existence, even persistent existence, of rumors that appellants were skinheads.  However, none had heard any officer make such an allegation, albeit several officers made non-hostile inquiries as to why appellants had shaved their heads.  Some officers also testified to the existence of rumors that Willis had started the rumors.  In his interview with Sergeant Smith, which took place about two weeks after appellants' interviews, Willis flatly denied that he had said anything to suggest the deputies were skinheads and stated that the whole affair put undue stress on him in his work.

During the individual interviews of appellants, each was informed that disciplinary action against them was being

9

considered based on the falsity of the EEOC filings. In addition to being questioned on how the skinhead rumors had started and the inconsistencies in some of their allegations, appellants were each questioned about the Woloszyn investigation.

Two reports resulted from the PSU investigation. The first, dated January 26, 2006, summarized former Captain Woloszyn's failure to thoroughly investigate the original blue form complaint as well as his submission of a false and misleading report to Assistant Chief Wasilewski in violation of Sections 2.8 and 4.3 of the Department's policies and procedures. See Note 1, supra.

The second, dated January 31, 2006, summarized the circumstances found to involve a violation of Department policies and procedures in the filing of a false EEOC report by Cox and McCarty. This was based on Cox and McCarty's conceded lack of first-hand knowledge of harassment or confrontational behavior by Willis, even though each alleged a face-to-face confrontation with Willis in the EEOC complaint.

However, Sheriff Walsh, the head of the Department, decided not to take any official action against Cox and McCarty. Former Captain Woloszyn was demoted. Between appellants' interviews and Sheriff Walsh's decision not to pursue charges against them, Cox and Matthews, the then-acting Union President, unsuccessfully attempted to obtain a copy of the PSU report upon the conclusion

10

of the investigation.

On February 16, 2006, appellants filed a second round of EEOC complaints, this time alleging that the PSU investigation and threats of false reports charges were illegal retaliation for their harassment complaints. The EEOC found evidence of retaliation, finding the department's decision to investigate and consider disciplinary action against appellants for making false allegations in an EEOC complaint to have been discriminatory. It noted that such actions might "have [had] a chilling effect upon the willingness of individuals to speak out against employment discrimination or to participate in the EEOC's administrative process or other employment discrimination proceedings."

Appellants were issued notices of their right to sue and timely filed the present action on April 9, 2008. They alleged, in pertinent part, that they were victims of a hostile work environment and unlawful retaliation by the various appellees in violation of Title VII and N.Y. Exec. Law § 296. Appellants also alleged violations of 42 U.S.C. §§ 1981, 1983, 1985, and 1988; the Fourteenth Amendment; and Article 1, Section 11, of the New York State Constitution. Judge McCurn dismissed the claims asserted under 42 U.S.C. § 1981 and the Title VII hostile work environment claims sua sponte. Cox v. Onondaga Cnty. Sheriff's Dep't, No. 5:08-cv-387 (NPM), 2009 U.S. Dist. LEXIS 28101 (N.D.N.Y. Apr. 2, 2009). The remaining claims were later

11

dismissed on a grant of summary judgment by Judge Mordue, who held that there was no evidence of a requisite adverse employment action. Cox v. Onondaga Cnty. Sheriff's Dep't, No. 5:08-cv-387 (NAM), 2012 U.S. Dist. LEXIS 43913 (N.D.N.Y. Mar. 29, 2012).

Appellants have appealed the dismissal only of the retaliation claim. They also claim that Judge Mordue should have recused himself because of a prior relationship with Sheriff Walsh.

DISCUSSION

We review an appeal from a grant of summary judgment de novo. See, e.g., Terry v. Ashcroft 336 F.3d 128, 137 (2d Cir. 2003). Summary judgment is appropriate only where there are no issues of material fact and the movant is entitled to judgment as a matter of law. Id. We may, however, affirm on any ground with support in the record. McElwee v. County of Orange, 700 F.3d 635, 640 (2d Cir. 2012).

In order to show a prima facie case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the

12

protected activity. <u>Kessler v. Westchester Cnty. Dep't of Soc. Servs.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006).[2]

Once an employee establishes a <u>prima</u> <u>facie</u> case, the burden shifts to the employer to put forth evidence of a non-retaliatory rationale. <u>See</u> <u>Holt v. KMI-Continental</u>, 95 F.3d 123, 130 (2d Cir. 1996). Once the employer has done so, the employee may prevail by demonstrating that the stated rationale is mere pretext. <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173, 179-80 (2d Cir. 2005). The employee at all times bears the burden of persuasion to show a retaliatory motive. <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993). The district court held that appellants had failed to establish a <u>prima</u> <u>facie</u> case because they had suffered no adverse employment action.

Appellants argue that several aspects of the PSU investigation amount to the requisite adverse employment actions: (i) the investigation was conducted by the PSU instead of within the Department in contrast to other investigations of allegations of harassment or hostile work environment that were handled

---

[2] The statutory provision reads in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

internally; (ii) the PSU's interview of Deputy Willis was less confrontational than their own; (iii) the PSU interviews were more preoccupied with the failings of Captain Woloszyn's investigation and the authorship of appellants' paperwork and filings than with the substance of their allegations; and (iv) appellants' request for a copy of the PSU report was denied on the grounds that disciplinary action was pending. We deal separately, infra, with the portion of appellants' retaliation claim resulting from the fact that they were informed during the investigation that they could be brought up on criminal and administrative charges based on their false complaint to the EEOC.

As noted, adverse employment actions are those that "well might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations and citations omitted). However, "[c]ontext matters," and so "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. at 69.

a)   The PSU Investigation

An employer's investigation of an EEOC complaint alleging racial harassment without more -- that is, without additional particularized facts evidencing a retaliatory intent and

14

resulting in, or amounting to, adverse job consequences for the complainant -- cannot sustain a valid retaliation complaint.

While the relevant statutory provisions do not require an employer's investigation, as was the case in <u>Malik v. Carrier Corp.</u>, 202 F.3d 97, 105-06 (2d Cir. 2000) (federal law required investigation into workplace sexual harassment; failure to do so was basis for employer liability), they clearly contemplate that employers facing charges before the EEOC will fully inform themselves of all relevant circumstances.  After a complaint has been filed, "in writing under oath or affirmation," the Commission must give notice to the employer within 10 days.  42 U.S.C. § 2000e-5(b).  Then the Commission investigates.  After the EEOC has determined that there is reasonable cause to believe that a complaint is true, the respondent (the employer) generally will be asked to submit a position statement with supporting documentation.  29 C.F.R. § 1614.108.  Occasionally, the Commission will conduct a fact-finding conference in order to investigate, which can include a meeting intended to determine what facts are disputed and undisputed.  "Agencies may use an exchange of letters or memoranda, interrogatories, investigations, fact-finding conferences or any other fact-finding methods that efficiently and thoroughly address the matters at issue."  29 C.F.R. § 1614.108(b).  Then the Commission engages in "informal methods of conference, conciliation, and

persuasion." 42 U.S.C. § 2000e-5(b). The respondent has 30 days to reach a "conciliation agreement" with the Commission in order to remedy the discrimination. 42 U.S.C. § 2000e-5(f)(1).

These provisions clearly contemplate that employers must be allowed to inform themselves of all facts relevant to an EEOC complaint. Employers have a right to answer an EEOC complaint and are asked not only to engage in conciliation but also are sometimes asked to present their view of the facts. If employers are at risk of liability from conducting a non-overreaching internal investigation, meaningful conciliation and fact conferences are not possible.

Moreover, we cannot blind ourselves to the fact that an employer's failure to conduct an investigation when faced even with an internal complaint, much less a charge to the EEOC, might be viewed as evidence of an indifference to racial discrimination, if not acquiescence in it. Indeed, we can say with confidence that the law must give breathing room for such investigations to be carried out. See Malik, 202 F.3d at 106-07 (law must take care not to "reduce [employers'] incentives to take reasonable corrective action," so "employer[s'] conduct of an investigation and determination of its scope must be viewed ex ante"); United States v. N.Y. Transit Auth., 97 F.3d 672, 677-78 (2d Cir. 1996) (granting employers leeway in how to investigate and defend against EEOC proceedings); cf. Tepperwien v. Entergy

16

Nuclear Operations, Inc., 663 F.3d 556, 568-70 (2d Cir. 2011) (fact-finding investigations that do not themselves qualify as disciplinary action but could lead to disciplinary action, where engaged in with good reason, do not constitute adverse employment actions under White).

Therefore, employees who complain of racial discrimination, whether internally and/or through an EEOC complaint, may not claim retaliation simply because the employer undertakes a fact-finding investigation.

Having said that, we quickly add that an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to "dissuade a reasonable worker from making or supporting a charge of discrimination."  See White, 548 U.S. at 57; see also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006) (an investigation that is lengthy in nature, prohibits promotions during its pendency, and by its very nature places a "cloud over [one's] career" qualifies as an adverse employment action under White).  Compare Rhodes v. Napolitano, 656 F. Supp. 2d 174, 185-86 (D.D.C. 2009) (noting that length and scope of an investigation into unrelated misconduct could satisfy the White standard), with Tepperwien, 663 F.3d at 568-70 (fact-finding

17

investigations engaged in with good reason that could but do not necessarily lead to disciplinary action constitute trivial harms or "petty and minor annoyances" that would not unduly dissuade a reasonable employee from seeking redress under Title VII).

Apart from the threat of disciplinary proceedings, dealt with separately infra, none of the circumstances relied upon by appellants, whether viewed individually or collectively, are sufficient to allow a finder of fact to find illegal retaliatory acts in the conduct of the PSU investigation.

First, appellants claim that their "blue form" complaint about racial harassment was the only such complaint to have been investigated by the PSU. However, the circumstances fully justified the investigation by the PSU. Woloszyn's failures ensured that any further attempt to handle these matters informally would be viewed with great skepticism. Indeed, appellants have not claimed that any similar matter -- allegations of harassment followed by a defective investigation -- had been handled informally.

Critically, moreover, the written policy of the Onondaga Sheriff's Department authorized PSU investigation of harassment complaints at the direction of the Chief. Unlike the circumstances in Stern v. Columbia University, therefore, the PSU investigation was not conducted by a body established in an ad hoc fashion to look into this matter only. 131 F.3d 305, 309 (2d

18

Cir. 1997). Even if appellants' complaint of racial harassment was the first to result in a PSU investigation, therefore, no trier of fact could find that it was prompted by a retaliatory motive or constituted a hostile work environment, constructive discharge, or deterrent to seeking relief from the EEOC.

Second, appellants rely upon the fact that Deputy Willis was treated less confrontationally during his PSU interview. However, Willis's interview occurred after the interviews of appellants revealed that, contrary to appellants' EEOC claim, no appellant (or anyone else) ever saw or heard Willis make any remarks about appellants being skinheads. Even assuming that the questioning of appellants and Willis was of a different character and the difference might be deemed cognizable retaliation, which we do not decide, there were sound reasons not to be confrontational with Willis.

Third, appellants' arguments regarding the nature and subject of the questioning during their respective interviews is frivolous. As noted, the PSU had before it a number of issues, all of which resulted from appellants' claims of racial harassment. The questioning complained of related to these matters and was clearly legitimate.

Finally, also frivolous is appellants' argument that their request for a copy of the PSU report was denied at the time it

was made.  Indeed, appellants identify no cognizable harm from that denial.

b)   <u>The Threats of False Report Charges Against Appellants</u>

As noted, during the PSU investigation, Sergeant Smith informed appellants that they might be brought up on charges as a result of having filed false statements.  When, a month later, appellants later inquired as to the status of the charges, they were told that charges were "pending."

We deal with the threat of false reports charges separately because it raises important issues as to the breadth of legally cognizable claims of retaliation for the filing of charges with the EEOC.  Obviously, such a threat would often -- even usually -- be a deterrent to reasonable employees making or supporting discrimination claims.

The statutory language, <u>see</u> Note 2, <u>supra</u>, is quite broad but falls well short of suggesting that an absolute privilege immunizes knowingly false EEOC charges.  Certainly, such conduct might support criminal charges under 18 U.S.C. §§ 1621 (perjury) and 1505 (obstruction of agency proceedings).

However, the fact that false charges before the EEOC are not permitted does not necessarily lead to the conclusion that the employers targeted by such charges are entitled to respond with disciplinary action against the filing employee.  Some circuits, <u>see, e.g.</u>, <u>Pettway v. Am. Cast Iron Pipe Co.</u>, 411 F.2d 998 (5th

Cir. 1969), have concluded that employers have no authority to "unilaterally" police abuses of the EEOC process. Id. at 1005. Others take the view that, "Title VII was designed to protect the rights of employees who in good faith protest the discrimination they believe they have suffered" and not to "arm employees with a tactical coercive weapon under which employees can make baseless claims simply to advance their own retaliatory motives and strategies." Mattson v. Caterpillar, Inc., 359 F.3d 885, 890-91 (7th Cir. 2004) (internal quotations omitted); see also Richey v. City of Independence, 540 F.3d 779, 784-86 (8th Cir. 2008) (where documentary evidence results in a conclusion that an employee has violated non-discriminatory company policy, even if the violations occurred in the context of a workplace harassment investigation, resulting adverse employment actions are not retaliatory).

One district court in this circuit has seemingly held that such threats are per se illegal retaliation. See Proulx v. Citibank, N.A., 681 F. Supp. 199, 200-01 (S.D.N.Y. 1988), aff'd without opinion, 862 F.2d 304 (2d Cir. 1988).[3] However, this court has applied a "good faith" requirement for protected activity in retaliation cases like the present one. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998),

[3] We note that while Proulx was affirmed by this court as to the quantum of damages, the liability finding was not appealed. See Proulx v. Citibank, N.A., 709 F. Supp. 396, 397 (S.D.N.Y. 1989).

21

abrogated in part on other grounds by <u>Nat'l R.R. Passenger Corp.</u> <u>v. Morgan</u>, 536 U.S. 101 (2002) ("Quinn need not establish that she successfully described in that complaint conduct amounting to a violation of Title VII.  She need only demonstrate that she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (internal quotations and citations omitted)).

In reviewing the facts of these various cases, we find no inconsistencies in their results when the ordinary <u>McDonnell-</u><u>Douglas</u> burden-shifting regime, which governs retaliation cases, <u>Terry</u>, 336 F.3d at 141, is applied.  Once the plaintiff has proffered sufficient evidence that a threat of discipline triggered by a claim of discrimination was made, a <u>prima</u> <u>facie</u> case of retaliation will usually have been established.

We therefore believe it fairly obvious that a <u>prima facie</u> case has been established in the present matter.  As noted, the burden of producing evidence of a non-retaliatory reason for the threat of discipline shifts to the Department, with the burden of showing pretext falling on plaintiffs, who bear the ultimate burden of showing illegal retaliation.  It may well be that retaliation cases based on such threats are generally strong and the employers' rebuttals generally non-existent or weak.  However, the facts of the present case may be a tad unusual, but

they are sufficient to support summary judgment for the appellees.

Sergeant Smith's statements about charges for making a false report being possible were completely reasonable in light of the record. Appellants, who had initiated the entire matter, had given materially inconsistent statements regarding Willis's behavior. These ranged from describing Willis as (understandably) asking why they had shaved their heads to stating that Willis had confronted them with accusations of being skinheads. The latter accusation was, on the record before us, false, and seemingly intentionally so. A misconduct complaint based on these false accusations had been filed by Assistant Chief Wasilewski and was referred to the PSU. Informing appellants of the possible results of the investigation was in fact fair to them.[4]

Moreover, the false statements were intended by the officers who made them, who were white, to establish a claim of racial harassment by an African American officer. In the context of racial tension within the Department, false charges against Willis could be viewed by a reasonable observer as themselves racial harassment of Willis. Indeed, Willis's deposition testimony indicated that he felt harassed by the accusations, and

---

[4] No due process claim has been asserted by appellants, who were, in any event, not charged.

23

the PSU report noted that he felt "undue stress" at work as a result.

Employers are under an independent duty to investigate and curb racial harassment by lower level employees of which they are aware. See Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009). This is because the primary purpose of Title VII "is not to provide redress but to avoid harm." Faragher v. City of Boca Raton, 524 U.S. 775, 806 (1998). It would therefore be anomalous to conclude that an employer is not allowed to investigate, with a view to discipline, false complaints of harassment that themselves might be viewed as intended as racial harassment. Otherwise, employers might have to choose between liability for retaliating against one group of employees or liability to another group for not preventing the first group from harassment of the second with false claims.[5]

Our decision is supported by another fact. Law enforcement officials are required to file reports accurately. The Department, therefore, has a greater interest in disciplining officers who do not take that obligation seriously than do most employers. The importance of this policy is underlined by the fact that a generally applicable, non-discriminatory, written

---

[5] Smith did not threaten that the charges would be brought unless the EEOC charge was dropped so that the matter could be closed rather than investigated. Compare Lore v. City of Syracuse, 583 F. Supp. 2d 345, 367 (N.D.N.Y. 2008) (statement that one will forego criminal and administrative charges if an EEOC complaint is dropped qualifies as an adverse employment action).

policy for dealing with false reporting exists in the Department. Moreover, a law enforcement officer who has filed a false charge under oath with a governmental agency may well be cross-examined about that false filing when a witness in an unrelated case where the officer's credibility is in issue. See Fed. R. Evid. 608(b).

In contrast, appellants have presented no evidence that the warning about disciplinary action was intended to retaliate for any reason other than the apparent falsity of their EEOC charges and the complex circumstances those false charges created. As noted, they have the ultimate burden of proof on that issue. Therefore, even if appellants have established a prima facie case on their retaliation claim based on the threat of false reports charges, the Department has presented evidence that defeats that claim as a matter of law.

c) Recusal

Title 28 U.S.C. § 455(a) requires a judge to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." Under the statute, recusal is required in specific contexts not relevant here as provided for in Section 455(b) and also wherever, "an objective, disinterested observer fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal." United States v. Yousef, 327 F.3d 56, 169 (2d Cir. 2003) (internal quotations and alterations omitted). The pertinent trigger for recusal is

25

the "appearance of partiality," <u>Chase Manhattan Bank v. Affiliated FM Ins. Co.</u>, 343 F.3d 120, 128-30 (2d Cir. 2003), and a denial of a motion to recuse is reviewed for abuse of discretion. <u>Id.</u> at 126.

Appellants argue that the fact that Judge Mordue recused himself from matters involving Sheriff Walsh in 2007 and 2009, <u>see</u> <u>Leader v. Onondaga County</u>, No. 09-cv-0493 (NAM/DEP), 2009 U.S. Dist. LEXIS 39296 (N.D.N.Y. 2009), citing a long relationship between the two, compels the conclusion that Judge Mordue should have recused himself from this litigation. We disagree.

While at one time there may have been a close relationship between Sheriff Walsh and Judge Mordue, it is undisputed that Judge Mordue, at the time of the instant litigation, had not seen or spoken to Walsh since March 2005. This fact, absent other details about the relationship, negates any inference of partiality. <u>See</u> <u>Independent Order of Foresters v. Donald, Lufkin & Jenrette, Ind.</u>, 157 F.3d 933, 945 (2d Cir. 1998) (passage of time negates inference of partiality).

d) <u>Unsealing the Record</u>

Much of this opinion refers at critical points to parts of the record that have been sealed. Because of the importance of the sealed material to our disposition of this matter, we order that the entire record on appeal be unsealed. <u>See</u> <u>Joy v. North</u>,

26

692 F.2d 880, 893 (2d Cir. 1982) ("[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons."); accord Stern, 131 F.3d at 307 (same).

                              CONCLUSION

     For the foregoing reasons, the judgment of the district court is affirmed.