Jane LEWIS, Plaintiff,

v.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., Defendant.

Civil No. 3:12–cv–406 (JBA).

United States District Court, D. Connecticut.

Signed Jan. 7, 2015.

Karen Baldwin Kravetz, Philip Gupta Kent, Susman, Duffy & Segaloff, PC, New Haven, CT, for Plaintiff.

Holly L. Cini, Sally Welch St. Onge, Jackson Lewis, Hartford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JANET BOND ARTERTON, District Judge.

This is an action by Plaintiff Jane Lewis alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by her employer, Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BI"). Ms. Lewis filed her Third Amended Complaint [Doc. # 41] on May 20, 2013. Defendant now moves [Doc. # 57] for Summary Judgment. Oral arguments were held on November 25, 2014. For the following reasons, Defendant's motion is granted in part and denied in part.

### I. Background
#### A. Plaintiff's Job

Plaintiff was hired by BI in 1999 as a Laboratory Technician III ("Lab Tech. III"). (Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 61] ¶ 14, Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 65] ¶ 15.) In this position, she is responsible for performing animal necropsy procedures, serving as a participant prosector, wet tissue trimming, processing, embedding and microtomy/cryotomy of histological specimens, and microscopic slide preparation. (Letter dated 11/1/99, Ex. E to Cini Aff. [Doc. # 59] at 2.) In layperson's terms, Plaintiff's job primarily comprises performing autopsies (necropsies) on animals varying in size from mice to monkeys, and gathering and analyzing tissues and other matter. (Def.'s 56(a) ¶¶ 25–26, Pl.'s 56(a)2 ¶¶ 25–26.) Plaintiff performs this work in both a laboratory (when doing necropsies) and an office setting (when doing toxicology and histology

workups on the tissues). (Def.'s 56(a)1 ¶¶ 29–30, Pl.'s 56(a)2 ¶¶ 29–30.) Plaintiff continues to work at BI today, still as a Lab Tech III, having never received a promotion. (Pl.'s Opp'n Mot. Summ. J. [Doc. # 64] at 2.)

#### B. BI's Occupational Health Services

Until several years ago, when BI outsourced its health services to Take Care Health Systems, BI maintained an Occupational Health Services ("OHS") Division on its campus, led by Dr. Edward Berman (who now works for Take Care). (Def.'s 56(a) 1 ¶ 45, Pl.'s 56(a)2 ¶ 45.) According to Dr. Berman, OHS acts "as an interface between the employees and the company to ensure that accommodations are made for employees with disabilities or with any medical problem and try to interface and provide the best suitable environment that meets the patient's needs as well as the company's needs without revealing the content of what their illness is actually, so to act as a filter between the employee and company and come up with a medical opinion." (Berman Dep., Ex. I to Cini Aff. & Ex. D to Opp'n at 18.) Thus, when an employee's physician notifies BI that the employee has medical restrictions, OHS is the entity responsible for clarifying and verifying the restrictions, and then determining, in consultation with the employee's supervisors and human resources, whether the employee can be reasonably accommodated while continuing to perform the essential functions of her job. (*Id.* at 45–46.)

#### C. BI's Leave Policies

Under BI's Family and Medical Leave of Absence policy, dated July 16, 2006, and its Family and Medical Leave Act policy, dated March 18, 2009, eligible employees are "entitled to 12 weeks of federal FMLA unpaid leave during a 12 month period, and a supplemental 4 weeks of unpaid leave over a 24 month period (pursuant to

Connecticut law)." (FMLA Policy Eff. 2006, Ex. B to Mastro Aff. [Doc. # 60] at 4; *see id.* at 1.) Additionally, BI's Short Term Disability Plan ("STD") guarantees employees of six years or more up to 180 days of fully paid leave (to run concurrently with FMLA leave) if they cannot work due to an injury. (FMLA Policy Eff. 2009, Ex. C to Mastro Aff. at 7.) The benefits "begin after 5 business days [7 as of January 1, 2009] of disability" (*id.* at 8) and end after 180 days or when the Company determines the employee is no longer disabled, whichever is sooner (*id.* at 9). "Generally, the Company or its designee will determine that [an employee is] no longer disabled when a physician releases [her] back to work," but "[i]n the event that a physician has released [an employee] to work but the Company determines that [she is] not fit for duty (or is unable to make a determination that [she is] fit for duty when [she is] released), [the employee's] short-term disability benefits may continue." (*Id.*) If an employee "return[s] to work after being on short-term disability leave for less than 180 days and a *different* disability occurs, the subsequent period of absence will be treated as a new short-term disability period [and the employee will be entitled to another 180 days], regardless of how long it has been since [she returned to work]." (*Id.* at 10.)

1. It was Plaintiff's third back surgery, but the first in the time period relevant to this suit (2008 to the present).

2. PA Watson and Dr. Brown instructed that in her first week back, Ms. Lewis should work only two days for four hours each day; in her second week, she could work three days a week for four hours a day; in her third week, she could work three days a week for six hours a day; and in her fourth week, she could work four days a week for eight hours a day. (Letters dated 6/12/08 and 6/18/08.)

3. PA Watson and Dr. Brown prohibited Ms. Lewis from lifting more than 10 pounds. (*Id.*)

### D. Plaintiff's Health

### 1. First Back Surgery (during relevant time period) [1], January 2008

On January 10, 2008, Plaintiff underwent back surgery, during which six screws and two rods were placed in her back and two fusions were conducted. (Opp'n at 2.) She applied and was approved for short-term disability on January 31, 2008, to continue for several months (she estimated 4–6 months; her doctor estimated 3–6 months). (Claim Report for Disability Ins., Ex. J to Cini Aff.) On June 12, 2008, Plaintiff's doctor, Dr. Cameron Brown and physician's assistant ("PA"), Sarah Watson signed off on a letter to Dr. Berman permitting Plaintiff to return to work part-time [2] on light duty [3] on June 23, 2008.[4] (Letters dated 6/12/08 and 6/18/08, Ex. K to Cini Aff.) Several days later, on June 18, 2008, PA Watson added that "Jane needs to use her cane at work to support her back and for security." (*Id.*)

Dr. Berman confirmed receipt of PA Watson and Dr. Brown's notes by letter dated June 20, 2008, and also requested that they specify which of Ms. Lewis's job responsibilities she would be unable to per-

4. The June 12, 2008 letter, submitted as an exhibit by Defendant, states: "see attached forms for duties." (Letters dated 6/12/08 and 6/18/08.) No forms are attached to Defendant's exhibit. However, there are several pages attached to the June 26, 2008 letter from PA Watson to Dr. Brown. (Letter dated 6/26/08, Ex. L to Cini Aff.) These pages include notes by PA Watson which she signed and dated June 12, 2008. (*Id.*) The Court will infer that these pages (the first two pages attached to the letter, but not the third) were actually attached to the June 12, 2008 letter, and not the June 26, 2008 letter.

form. (Letter dated 6/20/08, Letter dated 11/1/99.) PA Watson responded by letter dated June 26, 2008, in which she stated that "while Jane is performing trimming, imbedding and microtomy she must be allowed to sit for one hour and rest for two hours." (Letters dated 6/12/08 and 6/18/08.) She also reiterated her prior admonition against lifting more than ten pounds and her permission for Ms. Lewis to return to work. (*Id.*) The record does not contain any information about communications between PA Watson/Dr. Brown and Dr. Berman or within OHS between June 26, 2008 and August 4, 2008.

On August 4, 2008, Dr. Brown sent Dr. Berman a letter stating that Ms. Lewis was able to return to work the following day with the same restrictions indicated in prior letters. (Letter dated 8/4/08, Ex. N to Cini Aff.) The same day, Patricia Diaz, a human resources employee of BI, wrote to Plaintiff notifying her that she could return to work that day, and that BI was "able to temporarily accommodate the restrictions listed in [Ms. Lewis's] treating physician's letter dated June 26, 2008." (Letter dated 8/4/08, Ex. M to Cini Aff. & Ex. I to Opp'n.) Plaintiff returned to work, part-time, on August 5, 2008. (Lewis Dep., Ex. A to Opp'n & Ex. A to Cini Aff. at 89.) On October 2, 2008, PA Watson and Dr. Brown permitted Plaintiff to return to working full-time (but retained the light duty restrictions). (Letter dated 10/2/08, Ex. O to Cini Aff.)

### 2. Finger Surgery, November 2008

However, in January 2008, while Ms. Lewis was home recovering from her back

surgery, she tore a ligament in her left finger as she tried to stop her fall when her knee buckled (Lewis Dep. at 113) for which she underwent finger surgery on November 10, 2008 [5] (*see* FMLA Application, Ex. Q to Cini Aff.). She submitted an application for leave on November 7, 2008, requesting five paid time off ("PTO") days and then STD coverage. (*Id.*) In her application, she noted: "I am not requesting FML—used it already in beginning of year." (*Id.*) Nonetheless, by letter dated November 21, 2008, BI "confirm[ed] [that Plaintiffs] absence beginning on November 17, 2008 ha[d] been designated as FMLA leave (November 10, 2008 through November 14, 2008 will be designated as PTO per Company Policy)" and noted that "FMLA runs concurrently with the Short–Term Disability policy." (FMLA approval, Ex. R to Cini Aff. & Ex. F to Opp'n.) Ms. Lewis testified that upon receiving this letter, she called HR to clarify that she was not "supposed to be getting" FMLA leave but was told that it was fine. (Lewis Dep. at 126.)

By letter dated November 24, 2008, Dr. Berman wrote to Dr. Samir Sodha, Plaintiffs finger doctor, requesting information regarding Ms. Lewis's prognosis and ability to perform her duties. (Claim Report for Disability Ins. at 1.) Dr. Sodha's response [6] was apparently [7] received by Dr. Berman on November 26, 2008. (*Id.* at 2). In it, Dr. Sodha indicates that Plaintiff can perform most or all of her duties with her right hand. (*Id.* at 2–4.) By letter dated

---

**5.** Plaintiff explained that the long delay between the occurrence of the injury and the surgery was due to doctors' inability to determine what was wrong with her finger. (Lewis Dep. at 113–14.)

**6.** The notes in the margin of this document are, according to Dr. Berman, those of Dr. Sodha. (*See* Berman Dep. at 170, 178.)

**7.** The response is undated but Dr. Berman signed and dated it 11/26/08. Dr. Berman testified with regard to a similar signature at the bottom of a different doctor's note that the signature indicated he had read it by that date. (*See id.* at 188.)

December 4, 2008, PA Watson wrote to BI to clarify that "Jane's current lumbar condition is separate from any upper extremity [finger] issues that she may have or is being treated for at this time. Her lumbar condition will not interfere with her upper extremity issues. Her restrictions remain unchanged as previously stated in previous letters." (Letter dated 12/4/08, Ex. S to Cini Aff. & Ex. K to Opp'n.) Several days later, on December 9, 2008, Dr. Sodha completed a BI medical documentation form for Ms. Lewis, indicating that she could return to work on December 15, 2008 with the following restrictions: "No wet tissue trimming or prosecting with left hand." (Med. Doc. Form dated 12/9/08, Ex. T to Cini Aff.) In addition, the note stated that the last day of Ms. Lewis's restrictions would be February 1, 2009. (*Id.*)

On December 16, 2008, Ms. Lewis emailed several members of BI's HR department to inquire about why she had not been permitted to return to work. (*See* Email dated 12/16/08, Ex. L to Opp'n.) In the email, Plaintiff describes having been asked for and submitting documentation from Dr. Sodha to HR on three separate occasions between November 6, 2008 and December 9, 2008, and each time being told that the documentation was insufficient. (*Id.*) She emphasizes that her finger and back issues are separate and that both her finger and back doctors had already permitted her to return to work. (*Id.*) By letter dated the next day, December 17, 2008, Ms. Diaz informed Plaintiff that BI was "unable to temporarily accommodate the restrictions listed in [Dr. Sodha's] letter dated December 9, 2008" because of "insufficient and conflicting information regarding the restrictions to perform the essential duties of the job" and "[t]herefore, in order ... to reassess [Plaintiffs] case, [HR] need[ed] an updated assessment and documentation

from both of [her] treating physicians on [her] ability to perform the essential duties of [her] job." (Letter dated 12/17/08, Ex. U to Cini Aff. & Ex. N to Opp'n.)

PA Watson responded the same day, December 17, 2008, reiterating that "Jane can go back to work light duty status as previously stated on the attached and enclosed letter. I see no restrictions that are separate from the previous letters that would keep her from getting back to work at this time. As previously stated her lumbar condition will not interfere with her upper extremity issues that she has been treated for by a separate orthopedic physician." (Letter dated 12/17/08, Ex. V to Cini Aff. & Ex. M to Opp'n.) By letter dated January 20, 2009, Dr. Sodha informed BI that Plaintiff could return to work "with unrestricted use of the LEFT hand." (Letter dated 1/29/09, Ex. O to Opp'n (emphasis original).) There is no response from BI in the record.

### 3. Second Back Surgery, February 2009

On February 1, 2009, still out of work, Plaintiff emailed HR again to ask why she had still not been reinstated and to notify BI that she required another back surgery and would be taking STD as of February 10, 2009. (Email dated 2/1/09, Ex. W to Cini Aff.) By letter dated February 12, 2009, PA Watson wrote to inform BI that Ms. Lewis had undergone the surgery and that she would be "out of work for approximately 5–6 mo[n]ths" with an anticipated return date of August 10, 2009. (Letter dated 2/12/09, Ex. X to Cini Aff.) On February 23, 2009, BI emailed Ms. Lewis a medical certification form. (Email dated 2/23/09 and attachment, Ex. Y to Cini Aff.) PA Watson completed the form on March 4, 2009, writing that Plaintiff was expected to be incapacitated for three to six months

after the surgery. (*Id.*) Ms. Diaz replied to Plaintiff's February 1, 2009 email by letter dated March 5, 2009, noting that Plaintiff's "FMLA and CT FMLA leave ... began on November 17, 2008 for [her finger surgery] and for [her second back surgery]" and "ended March 2, 2009." (Letter dated 3/5/09, Ex. Z to Cini Aff. & Ex. P to Opp'n.)

On July 17, 2009, PA Watson/Dr. Brown notified BI that Plaintiff would be able to return to work part-time on light duty as of July 27, 2009. (Letter dated 7/17/09, Ex. AA to Cini Aff.) However, in its July 31, 2009 response, BI informed Plaintiff that it was "unable to accommodate the restrictions listed in [her] treating physician's letter dated July 17, 2009" and warned that "[i]f by August 10, 2009 [she was] not able to return to work, with or without a reasonable accommodation, [her] employment with Boehringer Ingelheim [would] be terminated effective August 11, 2009." (Term. Letter, Ex. BB to Cini Aff & Ex. Q to Opp'n.) Plaintiff's then-counsel Attorney Julia Goings–Perrot emailed BI on August 5, 2009, complaining that she had attempted to contact BI by email and phone and· had not received a reply. (Email dated 8/5/09, Ex. S to Opp'n.) She added that because Plaintiff had already been cleared to return to work, Plaintiff intended to report to work on August 10, 2009. (*Id.*)

By letter dated August 6, 2009, PA Watson notified BI that Plaintiff could return to work full time as of August 10, 2009 with a few restrictions. (Letter dated 8/6/09, Ex. CC to Cini Aff. & Ex. T to Opp'n.) Plaintiff alleges that although the letter is dated August 6, 2009, when she called BI on August 10, 2009, she was told that BI had not received it. (Lewis Dep.

at 168.) On August 7, 2009, Plaintiff filed charges with the Equal Employment Opportunity Commission.[8]

Ms. Costigan replied to PA Watson's August 6 letter by letter dated September 9, 2009 requesting clarification of some of Plaintiff's restrictions. (Letter dated 9/9/09, Ex. DD to Cini Aff.) PA Watson responded by note dated September 10 with a detailed list of Plaintiff's restrictions. (Ex. EE to Cini Aff.) Ms. Costigan wrote again on October 9, 2009, requesting a minor clarification regarding one of Plaintiff's restrictions (Letter dated 10/9/09, Ex. FF to Cini Aff.), and Ms. Lewis was finally put back to work on December 17, 2009 (Lewis Dep. at 193).

Upon returning to work, Plaintiff received her annual performance evaluation ("Max Plan") from supervisor Brian Knight for her performance in 2009. (*See* Max Plan 2009, Ex. JJ to Cini Aff & Ex. FF to Opp'n; Knight Dep., Ex. A to Opp'n & Ex. G to Cini Aff. at 174.) The assessment included the following comments with regard to Plaintiff's individual goals: "Jane did not work on any toxicology studies in 2009. As a result, Jane's performance over the past year has not been fully satisfactory, is below that of her peers, and Jane is rated Did Not Meet expectations." (Max Plan 2009.) With regard to her core job performance, Dr. Knight noted: "For the 4 days that Jane was in the department she was performing at limited duty. As a result, Jane's performance over the past year has not been fully satisfactory, is below that of her peers, and Jane is rated Partially Met expectations." (*Id.*) Plaintiff, for her part, commented: "I was not here to participate and meet my goals for the company this year due to the fact that

8. The Commission later determined that there was no probable cause. (3d Am. Compl. ¶ 16). Plaintiff received a *Right to Sue Notice* from the Commission on or about December 21, 2011. (*Id.* ¶ 15.)

the company kept me out of work on paid administration leave for over 10 months due to my temporary useage [sic] of a cane for my disability, even though my doctor cleared me to return to work. I have worked for BI[ ] for over 10 years and have always performed up to company standards even with my disability. I feel this 'not met' is [sic] taken away my dignity and eligibility for advancement within the company." (*Id.*)

Plaintiff met with Dr. Knight on two occasions in January and February 2010 to discuss Plaintiff's 2009 performance and to go over her "coaching plan." (*See* Coaching Plan, Ex. HH to Cini Aff. & Ex. U to Opp'n.) The plan states that in light of Plaintiff's 2009 performance, "in order to fully meet the expectations of a LAB TECHNOLOGIST, you need re-training. To support your improvement in these areas we are embarking on a coaching plan during the next three months. The purpose of this coaching plan is to ensure that you have a clear understanding of the responsibilities and the factors on which you are being measured as well as coaching in order to build these skills." (*Id.*) The plan concluded with the admonition: "While we have every expectation that the coaching process will be successful, if you are not meeting the expectations outlined in the coaching plan, further corrective action may need to be taken." (*Id.*)

Plaintiff completed the re-training in June 2010 and received a letter from supervisor Michael Lipinski notifying her that she had "achieved an acceptable level of performance and ha[d] completed [her] Coaching Plan." (Memo dated 6/30/12, Ex. II to Cini Aff. & Ex. V to Opp'n.) However, the letter warned, "[e]ven though the Coaching Plan has concluded, you must maintain an acceptable level of performance going forward at all times. If your

performance falls below acceptable levels again, you may be subject to further disciplinary action, up to and including termination of employment." (*Id.*) [9]

## II. Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed.R.Civ.P. 56(c).

## III. Discussion

Plaintiff contends that BI's conduct between 2008 to 2010 and continuing to the present (*see* 3d Am. Compl. ¶ 14) violates four provisions of law: (1) discrimination as defined by the ADA; (2) retaliation for

---

9. *See* Appendix I for timeline of events.

Plaintiff's exercise of her rights under the ADA; (3) interference with the exercise of Plaintiff's FMLA rights; and (4) retaliation as defined by the FMLA. Each claim is addressed below.

### A. ADA Claims (Count One)

#### 1. Discrimination

The Americans with Disabilities Act prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" is one form of discrimination, "unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

■ To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that: "(1) h[er] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of h[er] disability." *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001) (internal quotation marks omitted). Once a plaintiff establishes a prima facie case, "then the burden of production shifts to the defendant[ ] to provide a legitimate, nondiscriminatory reason for [its] decision." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002).

Defendant conceded at oral argument that Plaintiff has made a prima facie case that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; and (3) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation. Only the fourth prong—whether Plaintiff suffered an adverse employment action because of her disability—is in dispute.

■ A plaintiff suffers from "an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks and citations omitted). For example, "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.* (internal quotation marks omitted). In determining material adversity, "context matters, as some actions may take on more or less significance depending on the context." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir.2011) (internal quotation marks and citations omitted).

Plaintiff's Complaint lists several incidents of alleged discrimination taken against her because of her disability. Each is addressed below.

#### a. Delay in Reinstatement

Plaintiff contends that BI discriminated against her by refusing to permit her to return to work despite having received medical clearances in June 2008, Decem-

ber 2008, and July 2009. According to Plaintiff, because of BI's delays, she was able to work on only four days in 2009, and as a result, she received a negative evaluation for 2009. That negative evaluation caused her to be denied a bonus for 2009 and to be awarded only a small salary increase. Plaintiff alleges that had she been permitted to return to work when she was cleared by her doctors, she "would have had a prorated bonus" of $2,500 and a salary increase of two or three percent (instead of the one percent raise she actually received). (Lewis Dep. at 255–56, 456.) Plaintiff additionally appears to as-sert that the delays caused her emotional distress. At oral argument, she contended that BI's refusal to reinstate her denied her the dignity of work, and the record demonstrates that Plaintiff underwent stress and aggravation as a result of the delays. (See Email dated 12/16/08.)

The record clearly supports Plaintiff's claims that: (1) she was cleared to return to work before she was actually reinstated [10]; (2) her negative 2009 evaluation was due solely to her absences in 2009 [11]; and (3) the negative evaluation caused her not to receive a bonus and to receive only a small salary increase.[12] Defendant argues,

10. Plaintiff was initially cleared to return to work following her first back surgery in June 2008, but BI did not reinstate her until August 2008. (3d Am. Compl. Count One ¶ 6.) With respect to her finger surgery, the record shows that although Plaintiff was cleared to return to work in December 2008 (see Letter dated 12/4/08; Med. Doc. Form dated 12/9/08), she had still not been permitted to return as of the commencement of her second back surgery leave on February 10, 2009 (see Email dated 2/1/09). Finally, with regard to her second back surgery, the record demonstrates that Plaintiff was cleared to return to work in late July or early August 2009 (see Letter dated 7/17/09; Letter dated 8/6/09), but was not permitted to return until December 17, 2009 (see Emp. History, Ex. D to Cini Aff.).

It should be noted that although Plaintiff claims that she was kept out from November 2008 until December 2009 (3d Am. Compl. Count One ¶ 10(a)), this is contradicted by her testimony (see Lewis Dep. at 142) and the record evidence (see Email dated 2/1/09), which demonstrate that Plaintiff requested leave commencing February 10, 2009, and therefore Plaintiff's claim is limited to being kept out of work between November 2008 and February 9, 2009.

11. Dr. Knight testified that the 2009 evaluation was "based on the four days that [Plaintiff] was in the office" and in those four days, she did not meet the goals she set for herself for the year (because she did not work on toxicologic studies) and she only partially met the core job performance goals for the year. (Knight Dep. at 171–74.) Dr. Knight added

that he received instructions from HR about what to write on Ms. Lewis's evaluation because he did not know how to evaluate an employee who had been on disability for much of the year. (Id. at 168–74.)

12. Dr. Knight explained that the yearly evaluations control an employee's bonus and raise. (Id. at 177–78.) An employee who is awarded a "partially met" or "did not meet" on the individual goals section of the yearly evaluation will receive a small bonus or no bonus, respectively. (Id.) Similarly, an employee who has been deemed to have "partially met" or to not have met expectations on the core job performance section of the yearly evaluation will receive a small raise or no raise, respectively. (Id.) Since Plaintiff received a "did not meet" on the individual goals section and a "partially met" on the core job performance section of her 2009 evaluation, she was awarded no bonus and a small raise. (Id.) Defendant attempted to reframe the bonus and raise as "discretionary" in its Reply and at oral argument, but it has not pointed to any evidence in the record to support this claim which apparently contradicts Dr. Knight's testimony. (Reply [Doc. # 66] at 5, 6.) Defendant cites to Pl.'s 56(a)2 ¶ 149 as support (see id. at 6), but although Plaintiff does admit ¶ 149, the admission neither uses the word "discretionary" nor describes a discretionary process for determining raises and bonuses (Pl.'s 56(a)2 ¶ 149 ("Employee bonuses are based upon a Variable Performance Related ('VPR') measure which is tied to individual quantifiable production goals, tailored to each employee and which the employee

however, that its delay in reinstating Plaintiff was not discriminatory because Plaintiff was paid for the time and because leave itself is an accommodation.

 Other courts in this district have held that delays in reinstatement may constitute adverse actions, *see Glover v. New York City Transit Auth.*, No. 03 CV 1140(RJD)(LB), 2006 WL 3056340, at *8 (E.D.N.Y. Sept. 7, 2006) *report and recommendation adopted*, No. 03 CV 1140 RJD LB, 2006 WL 3083495 (E.D.N.Y. Oct. 20, 2006) ("A delay in reinstating an employee constitutes an adverse employment action"); *Greenberg v. New York City Transit Auth.*, 336 F.Supp.2d 225, 247 (E.D.N.Y.2004) ("Certainly, a delay in reinstating an employee constitutes an adverse employment action"), but the question of whether such delays can be materially adverse actions *when the employee is on paid leave while awaiting reinstatement* is a novel one, *see Glover*, 2006 WL 3056340, at *8, n. 6 (noting that "had plaintiff been put back on the payroll pending his reinstatement, defendant's delay would not be so troubling"), as is the related question of whether, and at what point, a reasonable accommodation of disability leave that is unnecessarily prolonged becomes unreasonable or discriminatory. Here, although Plaintiff was paid for her leave, there is a material question of fact regarding whether she nonetheless suffered economic and emotional damages as a result of her employer's delays in reinstating her. There is additionally a material question of fact regarding whether the delays, totaling eight or nine months, were motivated by discriminatory intent. The Court can see no reason why an allegedly discriminatory act should be excluded from the jury's

purview simply because the employer has labeled it a reasonable accommodation.

Defendant disputes that there is a material question of fact with regard to motive, contending that it had a legitimate business reason for its actions: ensuring Plaintiff could safely perform her duties. (*See* Berman Dep. at 178–80.) Defendant explains that "[w]hen an employee's physician indicates the employee has medical restrictions on his/her ability to perform job functions, it is the role of OHS to clarify those restrictions, as necessary, and relate them as clearly as possible to Boehringer" and that "[i]t is typical that Boehringer asks the employee to remain out of work while OHS is processing an accommodation request to ensure the safety of all involved." (Def.'s Mem. Supp. Summ. J. [Doc. # 58] at 10–11.)

Plaintiff's evidence could reasonably be found to show, however, that Defendant's explanation is pretextual. There were, for example, long stretches of time during which Plaintiff's doctors had submitted medical clearance letters on Plaintiff's behalf and Defendant appeared to be delaying her reinstatement without reason. Additionally, the record contains evidence from which discriminatory intent by Plaintiff's supervisors and the HR personnel which could reasonably be inferred, undermining Defendant's asserted rationale for its delays.

Plaintiff alleges that after requesting an ergonomic chair, she was forced to "measure the chairs in the department and to mark broken chairs in an effort to harass, intimidate and humiliate her." (Opp'n at 5; Lewis Dep. at 220–21.) Plaintiff also describes an incident with Patricia Diaz (HR) which she asserts she "will never

---

sets for him/herself, and approved by the manager, such as the number of studies an

employee conducts." (emphasis added))).

forget ... as long as [she] live[s]" because it was so upsetting. (*Id.* at 233.) According to Plaintiff, when she returned from leave, Ms. Diaz told her: " 'The reason why I didn't think you should come back was because I was greatly afraid that ... you would be looking like this,' " and then she stood and "grabbed the wall like an invalid" and "mimicked a person grabbing on for dear life to the walls." (*Id.*)

Plaintiff additionally alleges that she was forced to take a week of (paid) vacation because of her disability when her supervisors were out on leave in December 2009 even though she had already been reinstated and other employees were not subjected to the same requirement. (*Id.* at 193; 3d Am. Compl. Count One ¶ 10(*o*).) Finally, Plaintiff claims that on at least one occasion, she was forced to use her PTO time to cover a 30 minute break even though she had skipped her 15–minute breaks and a flex policy was in place for technicians under which they were permitted to distribute their break time throughout the week. (*Id.*; Emails dated 12/29/09, Ex. GG to Opp'n; Knight Dep. at 62, 72, 320.) Defendant does not respond to any of these allegations.

Together, this evidence could permit a reasonable jury to conclude that Defendant's delays in reinstating Plaintiff after her disability leaves constituted materially adverse actions and/or failures to accommodate and that such actions were motivated by discriminatory intent on the basis of Plaintiff's disability. Summary judgment is therefore not appropriate on this claim.

### b. Failure to Promote

■ The Second Circuit has established a four-prong test for determining whether a plaintiff has demonstrated discriminatory failure to promote. A plaintiff must establish that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (discussing failure to promote claim in in Title VII context). There is no dispute that Plaintiff (1) is a member of a protected class, (2) requested promotions on several occasions,[13] (3) was not promoted, and (4) others were promoted. However, the employer vigorously disputes that Plaintiff was qualified for a promotion and that those who were promoted in her stead had the same qualifications as she.

Mr. Lipinski testified that promotions are only granted to employees who "demonstrate consistent performance and competency skills within the higher job level." (Lipinski Dep., Ex. F to Cini Aff. & Ex. B to Opp'n at 250.) Because Plaintiff has not demonstrated these skills, Mr. Lipinski stated, he has not recommended her for a promotion. (*Id.*) Plaintiff argues, by contrast, that the histology department maintained a policy of promoting employees automatically after two or three years, and the only reason she has not received a promotion is discrimination. This allegation, however, lacks sufficient factual support to survive summary judgment.

■ Ms. Lewis put forth no evidence of the existence ·of an automatic promotion policy; she failed to explain why, if there was such a policy, she was not promoted in

---

**13.** According to Plaintiff's undisputed testimony, BI does not have an application process for promotions. (Lewis Dep. at 263.) However, Plaintiff testified, and Defendant did not dispute, that Plaintiff asked Mr. Lipinski for a promotion "numerous times" since 2003, and she recalled a specific conversation on the topic in December 2011. (*Id.* at 264.)

2003, three years after she began in the histology department, and three years before she took her first medical leave; she failed to explain why Corinne Grant, a Tech II who has been employed by BI for eight years and has never taken a leave of absence, has not been promoted (*see* Mem. Supp. at 30); and she failed to explain why the employees she names in her deposition as having been promoted ahead of her (*see* Lewis Dep. at 261–64) are appropriate comparators. Moreover, Plaintiff has failed to rebut BI's assertion that she is not qualified for a promotion. Although her 2002 through 2008 evaluations show that she sometimes exceeded expectations in specific areas of assessment, the majority of her marks were "met expectations," and she never received an "exceeds expectations" for her summary assessment. (Max Plans, 2002–2008, Exs. Z, AA–EE to Opp'n.) Based on the available evidence, a reasonable jury could not find that BI refused to promote Ms. Lewis on the basis of her disability.

### c. Termination

█ Curiously, Plaintiff contends, and BI denies, that she was terminated on August 11, 2010, but put back to work the same day "due to the involvement of her then attorney." (Opp'n at 3.) Plaintiff's allegation arises out of a letter that she received from BI dated July 31, 2009 in which BI warned Plaintiff that "[i]f by August 10, 2009 [she was] not able to return to work, with or without a reasonable accommodation, [her] employment with Boehringer Ingelheim will be terminated effective August 11, 2009." (Term. Letter; *see* Lewis Dep. at 167–68.) Al-

though PA Watson wrote to BI in a letter dated August 6, 2009 that Plaintiff could return to work as of August 10, 2009 with a few restrictions (Letter dated 8/6/09), Plaintiff alleges that when she called BI on August 10, 2009, she was told that BI had not received the letter (Lewis Dep. at 168).[14] As a result, she believed she had been fired. (*Id.*)

Defendant is unequivocal that Plaintiff was never terminated and that the July 31, 2009 letter was merely a warning letter. (Reply at 3.) Whether or not Plaintiff was terminated, however, her claim fails because she has not alleged any facts from which the Court can infer that she incurred any damages due to the termination and therefore suffered any materially adverse action (as she was re-hired on the same day she alleges she was terminated.) Absent any demonstration of a materially adverse action, Plaintiff's termination claim fails as a matter of law.

### d. Re-training

█ Plaintiff contends that when she was finally permitted to return to work in December 2009, she was subjected "to a mandatory coaching plan [i.e. retraining] and heightened scrutiny" which was disciplinary in nature, damaged her reputation, humiliated her, and constituted a materially adverse action based on her disability. (Opp'n at 4–5.) Defendant denies that Plaintiff's retraining was an adverse action (Mem. Supp. at 28; *see* Lipinski Dep. at 196–97), explaining that the coaching plan "was used as a tool to help [Ms. Lewis] transition back into . . . doing the job fully after not performing the essential functions for such a long time, almost three

---

**14.** There is a discrepancy between Plaintiff's testimony during her deposition, in which she claims that she did not receive this letter until August 7, 2009 and her Loc. R. 56(a)2 Stmt. in which she admits (¶ 118) that "Plaintiff, via Ms. Watson, did send the requested informa- tion updating her restrictions on August 6, 2009 (on which Plaintiff was copied)" (Def.'s 56(a)1 ¶ 118). At oral argument, Plaintiffs counsel informed the Court that the admission at ¶ 118 was in error.

years. It was also used as a way of helping to protect the employee's safety as far as using the instruments, not getting injured, not injuring a co-worker." (*Id.*) Dr. Knight added that because "[t]he preclinical guide was put into effect [while Ms. Lewis was out] which changed operating procedures throughout small animal and large animal necropsy, . . . everybody was retrained in that capability, and Jane [was] required to be trained as well." (Knight Dep. at 321.) Dr. Knight also testified though that "[t]he coaching plans are . . . computer generated. . . . The act of putting a 'partially met' [on an employee's core job rating] precipitates the requirements. It's a push button." (*Id.* at 188.)

However, there is sufficient evidence in the record to permit a reasonable jury to find that some of these explanations are pretextual and demonstrate the adverse action taken. First, the very fact that Defendant has offered three different and somewhat contradictory reasons for the retraining is suggestive of pretext. Second, if the coaching plan was indeed precipitated by Plaintiff's poor 2009 evaluation, as alleged by Dr. Knight, it was plainly a disciplinary action meant to correct allegedly poor performance. Third, the coaching plan itself suggests that Plaintiff "need[s]" retraining because her 2009 performance was unsatisfactory and warns that "*other* corrective action" may need to be taken if Plaintiff does not meet the expectations outlined in her coaching plan (Coaching Plan (emphasis added)). In a similar vein, the "coaching plan conclusion" memo advises: "If your performance falls below acceptable levels *again*, you may be subject to *further* disciplinary action." (Memo dated 6/30/10 (emphasis added).) Fourth, according to Plaintiff, Dr. Knight told her that HR had instructed him to require the retraining, which is notable because it was also HR employees who instructed Dr. Knight to give Plaintiff

a negative evaluation and who mocked Plaintiff's disability when she returned to work.

Furthermore, if the retraining was a safety measure used to assist employees who had been absent for a long time, one would expect other employees absent for long stretches of time to be similarly required to undergo retraining upon returning to work. However, Mr. Lipinski testified that he did not receive retraining after he had been out on disability for five months in 2009. (Lipinski Dep. at 199–200.) Moreover, Corrinne Grant, a Lab Tech. II who assisted in Plaintiff's retraining, testified that she had not been asked to retrain or been aware of the retraining of any employee in the histology department who had been out on leave before or since Plaintiff. (Grant Dep., Ex. E to Opp'n at 93, 98.) She added that although she had followed her supervisor's instructions to retrain Ms. Lewis, in her opinion, the retraining was not necessary "[b]ecause you don't forget how to do a necropsy" and because Plaintiff had nearly a decade of experience doing necropsies. (*Id.* at 97.) Furthermore, if the retraining was intended to help Plaintiff "transition back into the workplace," as Mr. Lipinski claims (Lipinski Dep. at 196–97), it is unclear why Plaintiff was trained at the level of a new employee by individuals less skilled than she (Lewis Dep. at 201). If retraining was intended to teach Plaintiff about new guidelines, as Dr. Knight asserts (Knight Dep. at 321), Defendant offers no explanation as to why the training was not limited to those guidelines rather than stretching on for nearly four months and covering "[e]very aspect of the technical aspect of [Plaintiff's] job" (Lewis Dep. at 201).

Based on the foregoing, a reasonable jury could conclude that retraining was an adverse action intended to humiliate and

demean Plaintiff because of her disability. The question then becomes whether, under *Galabya*, that adversity was material, and after review of the record, the Court concludes that a reasonable jury could so find. *Galabya* instructed that a plaintiff may show material adversity by demonstrating that the alleged adverse action "created a materially significant disadvantage." 202 F.3d at 641. Such disadvantages include "a demotion that would constitute a serious professional setback and stigma," or a transfer "to an assignment that [i]s materially less prestigious, materially less suited to [the plaintiff's] skills and expertise, or materially less conducive to career advancement." *Id.* Although Plaintiff's retraining was not a permanent transfer, she was, for four months, confined to a position for at least part of the day that was stigmatizing and was materially less prestigious, materially less suited to her skills and expertise, and materially less conducive to career advancement than her regular position. As such, summary judgment on this claim is not appropriate.

### e. Delay in Providing Chair

■ Plaintiff contends that BI's delay in purchasing an ergonomic chair for her constituted discrimination in the form of a failure to accommodate. She claims that although she requested an ergonomic chair in February 2010 (Opp'n at 5), she did not receive such a chair until around November 2010. There is nothing in the record to support Plaintiff's claim that she made a request in February, but the record does show that by March 2010, the histology

department had agreed to purchase two ergonomic chairs for Ms. Lewis. (Letters dated March 2010, Ex. W to Opp'n.) In April 2010, Dr. Knight emailed Judy Legan, presumably another BI employee, to request that six chairs be ordered for the lab. (Chair Emails and Requisition Form, Ex. GG to Cini Aff. & Exs. X, Y to Opp'n.) However, those chairs were not actually ordered until November 18, 2010—eight or nine months after Plaintiff had requested them.[15] (*See id.*) When the chairs did finally arrive, Plaintiff testified that others in her lab occasionally took them for their own use, leaving Plaintiff unaccommodated, and her supervisors knowingly permitted this to happen. (*See* Lewis Dep. at 224–25, 250 (describing several occasions on which a coworker has taken the chair for his or her own use, and one occasion on which Plaintiff was "crippled over in pain" because she did not have the chair and "had to use a lopsided chair" and do a "rat necropsy on a … cardboard box instead of using a table.").)

Plaintiff cites *Fol v. City of New York*, No. 01 CIV.1115 (THK), 2003 WL 21556938, at *8 (S.D.N.Y. July 9, 2003) for the proposition that unjustifiable delay in granting reasonable accommodation may constitute a failure to accommodate. (Opp'n at 15.) Notwithstanding Defendant's attempt to distinguish *Fol* by claiming that the "case involved both resistance and years in delays" (Reply at 7), the actionable period of delay contemplated by the court in *Fol* was in fact quite similar to the period here—six or eight months[16]—

**15.** Defendant contests Plaintiffs allegation of delay, writing: "Mr. Lipinski approved Plaintiff's request to purchase ergonomic chairs costing over $500 each only three days after they were identified and requested by Plaintiff [in April 2010]." (Reply at 7.) Defendant ignores the fact, however, that although Mr. Lipinski approved the request in April 2010, the chairs were not actually ordered until

November 2010. (*See* Chair Emails and Requisition Form.)

**16.** The court did note that the plaintiff's requests for accommodation began several years prior to the granting of the accommodation, but it stated explicitly that its analysis was limited to the eight-month period because

and the court's decision does not mention resistance on the part of the employer. Moreover, since *Fol,* another court in this circuit has held that "a rational factfinder could conclude that [a] six-month delay [in providing the plaintiff with an ergonomic workstation] establishes a failure to reasonably accommodate Plaintiffs disability." *O'Toole v. Ulster Cnty.,* No. 1:12–CV–1228 (LEK/RFT), 2014 WL 4900776, at *8 (N.D.N.Y. Sept. 30, 2014).

This Court concludes that a reasonable jury could find that Defendant's delay of eight or nine months in providing Plaintiff with a reasonable physical accommodation constituted a failure to accommodate. To the extent that Defendant contends its delay in providing the chair was justified by safety concerns (Mem. Supp. at 32 ("cross contamination or other safety issues involved in the process of [Plaintiff's] job can be significant and have implications far down the road of a study, including health implications")), there is a genuine issue of material fact regarding whether an eight or nine month delay was justified by such concerns, and summary judgment is not appropriate.

### f. Delay in Providing Grabber [17]

Plaintiff additionally alleges that BI discriminated against her by delaying in providing her with a grabber. Plaintiff testified that she requested a grabber in December 2009 when she returned to work (Lewis Dep. at 211), but did not receive it until May or June 2010 [18] (*id.* at 214; Letters dated March 2010). Defendant does not appear to contest that the grabber was a reasonable accommodation, but rather argues that its delay was justified by safety and cross-contamination

concerns. (Mem. Supp. at 32; *see* Email dated 2/4/09, Ex. LL to Cini Aff.) As discussed above with regard to the chair, a reasonable jury could find that a delay of five or six months in affording Plaintiff a reasonable accommodation constitutes a failure to accommodate and summary judgment is not appropriate.

### g. Denial of Use of Cane

Next, Plaintiff asserts that Defendant "denied her use of a cane" (3d Am. Compl. Count One ¶ 10(m)), and that this denial constituted discrimination. PA Watson prescribed a cane for Plaintiff on June 18, 2008. (Letters dated 6/12/08 and 6/18/08.) Plaintiff claims that she "was refused, by Boehringer–Ingelheim, to come back to work [at that time] because of [her] cane and some of [her] restrictions." (Email dated 2/1/09.) However, in her deposition, she claims that it was in November 2008 that she was denied use of her cane. (Lewis Dep. at 65.) The record does not reveal at what point Plaintiff was actually permitted to use the cane, though Plaintiff does acknowledge that she was eventually given permission. On such a sparse record, no reasonable factfinder could quantify BI's alleged delay in permitting Plaintiff to use her cane so as to find a failure to accommodate.

### h. Hostile Work Environment

Plaintiff additionally argues that the effect of all of the above incidents created a hostile work environment in violation of the ADA, in that she had to fight to be reinstated after each of her leaves and to obtain reasonable accommodations at work, and she was repeatedly humiliated and singled out by her supervisors. (3d

---

of the statute of limitations. *See Fol,* 2003 WL 21556938, at *8 n. 14.

**17.** Plaintiff describes the grabber as "a long pole" she could use to "pick[ ] up things off

the floor" without bending over. (Lewis Dep. at 211.)

**18.** Plaintiff actually writes "2009" but it is apparent that this was in error.

Am. Compl. Count One ¶ 10(d).) "Although the Second Circuit has not expressly held that the ADA authorizes claims for hostile work environment, district courts have found that the ADA encompasses hostile work environment claims." *Monterroso v. Sullivan & Cromwell, LLP,* 591 F.Supp.2d 567, 584–85 (S.D.N.Y.2008) (citing *De La Cruz v. Guilliani,* No. 00CIV.7102 (LAK)(JCF), 2002 WL 32830453, at *9 (S.D.N.Y. Aug. 26, 2002)); *Scott v. Mem'l Sloan–Kettering Cancer Ctr.,* 190 F.Supp.2d 590, 599 (S.D.N.Y. 2002); *see also Lewis v. Erie County Medical Center Corp.,* 907 F.Supp.2d 336, 347–48 (W.D.N.Y.2012). Such claims are held to a "demanding" standard, *Monterroso,* 591 F.Supp.2d at 584, but the bar is not so high as to require a plaintiff to show the "the environment [in her workplace] ... [was] unendurable or intolerable," *Rosario v. City of New York,* No. 11–CV–09008 PAC SN, 2013 WL 782408, at *9 (S.D.N.Y. Jan. 9, 2013) *report and recommendation adopted,* 2013 WL 782581 (S.D.N.Y. Mar. 1, 2013) (internal quotation marks omitted). Rather, "the plaintiff must show that based on the totality of circumstances, the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *De La Cruz,* 2002 WL 32830453, at *9 (internal quotation marks and citations omitted).

Even taking full account all of the incidents described by Plaintiff in her deposition, however, reasonable jurors could not find from the actions Plaintiff complains of that her workplace was "permeated" with ridicule and insult sufficiently severe to create an abusive working environment.

#### i. Adverse Action in the Aggregate

■ Next, Plaintiff contends that even if each individual action taken against her does not constitute an adverse action, the aggregate of the incidents does. (Opp'n at 11.) Although incidents may be considered in the aggregate in the retaliation context, *see Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir.2010) ("[I]n determining whether conduct amounts to an adverse employment action [under Title VII], the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently "substantial in gross" as to be actionable."); *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 227 (2d Cir.2006) (determining that aggregate of minor incidents can constitute adverse action in a First Amendment retaliation suit brought via § 1983); *Givens v. Monroe Cnty.,* No. 11–CV–6592, 2014 WL 4794641, at *5 (W.D.N.Y. Sept. 25, 2014) (considering whether actions alone or in the aggregate constitute materially adverse actions sufficient for a retaliation claim under the ADA), courts have not yet recognized such claims in the discrimination context, *see Kaur v. New York City Health & Hosp. Corp.,* 688 F.Supp.2d 317, 332 (S.D.N.Y. 2010) ("[T]here is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiffs discrimination claim."); *Hill v. Rayboy–Brauestein,* 467 F.Supp.2d 336, 356 n. 22 (S.D.N.Y.2006) ("Although ... Title VII hostile work environment claims and retaliation claims involve different findings regarding adverse employment actions, the Plaintiff cites no law, and the Court is aware of none, that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim.").[19]

---

19. This is not a distinction without a difference. As explained by the Supreme Court in

As such, Plaintiff's aggregation argument fails as a matter of law.

### 2. Retaliation

 The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA]." 42 U.S.C. § 12203(a). To demonstrate retaliation under the ADA, a plaintiff must allege that: "(1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002). As noted earlier, "adverse actions" in the retaliation context are defined more broadly than in the discrimination context. For an allegedly retaliatory action to be materially adverse, the plaintiff must show that the action "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 67–68, 126 S.Ct. 2405.

 Here, although Plaintiff asserted at oral argument that she wishes to bring a retaliation claim, and although her Third Amended Complaint vaguely alleges that BI took adverse actions against her "as a result of … her exercise of her rights" (3d Am. Compl. ¶ 10), she never specifically identifies any instance in which she exercised any rights under the ADA and as a result of such exercise, suffered retaliatory action. Indeed, in spite of a few conclusory references to retaliation and the rote recitation of the legal standard for

a retaliation claim, Plaintiff's Opposition, like her Complaint, is devoid of any substantive arguments supporting a retaliation claim. On the basis of the evidence put forth by Plaintiff, no reasonable jury could find that BI retaliated against Plaintiff for exercising her rights under the ADA. Summary judgment is therefore granted on this claim.

### B. FMLA Claims (Counts Two and Three)

The FMLA entitles eligible employees to take up to twelve work weeks of unpaid leave annually for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "[A]t the end of an employee's leave the employee has the right to return to the position [s]he held before the leave or its equivalent, though this right is not absolute," *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir.2006) (citing 29 C.F.R. § 825.214(b)), and reinstatement may be denied "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness," 29 C.F.R. § 825.216(c).

The Act makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act, 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the Act, *id.* § 2615(a)(2). An

---

the context of a Title VII claim, "Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. We therefore reject the standards applied in the Courts of Appeals

that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

employee has a private right of action to seek both equitable relief and money damages "against any employer," *id.* § 2617(a)(2), who violates the Act, *id.* § 2615(a)(1). Plaintiff claims that BI violated her FMLA rights both by interfering with her exercise of such rights and by retaliating against her for exercising them.

### 1. Interference

■ To make out a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must show: "(1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined in the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA." *Geromanos v. Columbia Univ.*, 322 F.Supp.2d 420, 427 (S.D.N.Y.2004).

The parties confirmed at oral argument that there is no dispute that (1) Plaintiff was an eligible employee under the FMLA;[20] and (2) BI is an employer as defined by the FMLA. However, there is some dispute about elements (3), (4), and (5). In Plaintiff's Third Amended Complaint, she alleges that BI interfered with her exercise of her FMLA rights in the following ways: (1) "Defendant kept Plaintiff out of work from in or about November 2008 to December 17, 2009" (3d Am. Compl. Count Two ¶ 14(a)); (2) Defendant terminated Plaintiff in August 2009 (*id.* ¶ 14(b)); and (3) Defendant forced Plaintiff to retrain for her position in December 2009 (*id.* ¶ 14(d)).

### a. BI's Delay in Reinstating Plaintiff

Plaintiff alleges that BI violated her FMLA right to reinstatement by refusing to let her return to work for the period November 2008 to December 2009. (*Id.* ¶ 14(a).) This claim is somewhat disingenuous since by her own admission, Plaintiff *requested* leave beginning November 10, 2008 for her finger surgery. (*See* FMLA Application.) She was not cleared by her doctor to return to work following that surgery until late November or December 2008. (*See* Letter dated 11/23/08, Ex. J to Opp'n at 2; Med. Doc. Form dated 12/9/08.) Again, in February 2009, she requested leave beginning February 10, 2009 (*see* Email dated 2/1/09), and she was not cleared to return until July or August 2009 (*see* Letter dated 7/17/09; Letter dated 8/6/09). Thus, the most that Plaintiff can claim is that she was kept out of work from late November or December 2008 until February 2009 and then from late July or August 2009 to December 2009.

However, Defendant contends that by December 2008, Plaintiff had already exhausted her FMLA leave for the period January 10, 2008 to January 10, 2009[21] (by taking leave from January 10, 2008 to August 4, 2008[22]). (Mem. Supp. at 35.) In support of this assertion, Defendant offers Plaintiff's application for leave in November 2008 in which she expressly stated that she was not requesting FMLA leave because she had "used it already in begin-

---

**20.** Defendant titles one section of its brief "Plaintiff was not entitled to leave under the FMLA" (*see* Mem. Supp. at 35) but its argument is not that Plaintiff was not an eligible employee, but rather that she had exhausted her leave by November 2008 (as elaborated in section III.B.1.a of this Ruling).

**21.** Under BI's FMLA policy effective 2006 to March 2009, the 12–month period is calculat- ed counting forward from the start of the employee's first leave. (*See* FMLA Policy Eff. 2006 at 1.)

**22.** This first leave would have exhausted Plaintiff's entitlement even if the leave is treated as if it ended in June when Plaintiff's doctor cleared her to return to work.

ning of year." (FMLA Application.) The problem with this theory is that Defendant has put forth no evidence to demonstrate that the January to August 2008 leave had in fact been designated by BI as FMLA leave. That Plaintiff believed her leave was FMLA leave does not make it so. Under 29 C.F.R. § 825.301(b), (c) (eff. March 1995 to January 15, 2009), an employer is required to give an employee taking FMLA leave "written notice" that "the leave will be counted against the employee's annual FMLA leave entitlement" "no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave." *See also* 29 C.F.R. § 825.208(a) (eff. 1995 to Jan. 16, 2009) ("In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section.") There is no such notice in the record for Plaintiff's first leave.

 The record does contain, however, letters notifying Plaintiff that her *second* leave (for the finger surgery, beginning November 10, 2008) was designated as FMLA leave. (*See* FMLA approval; Letter dated 3/5/09.) Because Plaintiff's leave entitlement would have been exhausted by November 2008 had BI counted her January to August 2008 leave as FMLA leave (as argued by Defendant), the fact that BI designated Plaintiff's November 2008 leave as FMLA leave strongly suggests that her January to August was not so designated. Notwithstanding Defendant's arguments to the contrary (*see* Mem. Supp. at 35), Plaintiffs note on her November 2008 leave application that she was not seeking FMLA leave does not compel a different conclusion. Defendant classified the November leave as FMLA-qualifying in spite of Plaintiffs note, notified Plaintiff of this classification on two separate occa-

sions (*see* FMLA approval; Letter dated 3/5/09), and cannot now claim otherwise. Plaintiff does, therefore, appear to have been eligible to take FMLA leave beginning on November 10, 2008.

The question then is whether Defendant's refusal to permit Plaintiff to return to work in November or December 2008 (when she was medically cleared after her finger surgery) or January 2009 (when all restrictions on her use of her left hand were lifted) constitutes interference with her FMLA right to reinstatement. Plaintiff's finger doctor, Dr. Sodha cleared Plaintiff to return to work (with restrictions on the use of her left hand) on or about November 26, 2008. (*See* Letter dated 11/23/08.) On December 4, 2008 and again on December 17, 2008, PA Watson wrote to BI to clarify that her finger issue was separate from her back issue and that nothing had changed since she had last worked with regard to her back. (*See* Letter dated 12/4/08; Letter dated 12/17/08.) Dr. Sodha wrote to BI on December 9, 2008 clearing Plaintiff to return to work as of December 15, 2008 with minor restrictions on her left hand. (*See* Med. Doc. Form dated 12/9/08.) He wrote again on January 20, 2009, informing BI that Plaintiff could return to work "with unrestricted use of the LEFT hand." (Letter dated 1/29/09.) Still, BI refused to permit Plaintiff to return. As a result, Plaintiff was absent for a month or more of 2009 when she arguably should have been at work, and for the reasons explained in the ADA discrimination discussion above, that absence deprived her of the opportunity to earn a larger salary increase and a bonus in 2009. From these facts, a reasonable factfinder could conclude that BI's refusal to permit Plaintiff to return to work promptly after she was medically cleared to do so constituted interference with her right to reinstatement

in December 2008, to Plaintiff's material detriment.

▌ Plaintiff's next leave began on February 10, 2009. By that time, she had used between five and ten weeks of her leave time (depending on whether her finger surgery leave is considered to have properly ended on December 15, 2008 when she was cleared to return to work with minor hand restrictions or January 20, 2009 when she was cleared to return with no hand restrictions). She was therefore entitled to another two to seven weeks of leave as of February 2009. Plaintiff was not cleared to return to work after her second back surgery, however, until July 27, 2010 at the earliest. (*See* Letter dated 7/17/09.) By that time, it is undisputable that Plaintiff would have exhausted her FMLA leave entitlement. Having exhausted her leave before she was medically able to return to work, Plaintiff did not have a right to reinstatement by July 2010. *See* 29 C.F.R. § 825.216(c) (eff. Jan. 16, 2009 to March 7, 2013) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA."); *Esser v. Rainbow Adver. Sales Corp.*, 448 F.Supp.2d 574, 580 (S.D.N.Y.2006) ("the employee has no right to be restored to the position he or she held if the employee is unable to perform an essential function of the position because of a physical or mental impairment.").

**b. Termination**

Plaintiff next claims that her alleged termination on August 11, 2009 constituted interference with her FMLA rights. However, as explained above, by August 11, 2009, Plaintiff had exhausted her FMLA leave and therefore she had no rights with which BI could interfere by that date.

**c. Retraining**

Plaintiff's final FMLA interference claim—hat BI interfered with her exercise of her rights by forcing her to retrain at a lower level in December 2009 rather than reinstating her in her previous position—fails for the same reason as Plaintiffs termination claim; by December 2009, Plaintiff had exhausted her FMLA leave.

**2. Retaliation**

▌ In considering FMLA retaliation claims, the Second Circuit applies the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting analysis, under which a plaintiff must show that: "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Plaintiff appears to base her claim on the FMLA leave she was granted on November 17, 2008 to recover from her finger surgery. (*See* Opp'n at 20.) Any adverse actions occurring before this date then are not relevant to this claim. For the reasons discussed above, Plaintiff satisfies the first prong of an FMLA retaliation claim, and Defendant conceded the second prong at oral argument. However, the Court need not discuss the third prong because Plaintiff has not put forth sufficient evidence of retaliatory intent to make out an FMLA retaliation claim. Far from being punished for exercising her rights under the FMLA, Plaintiff appears to have been awarded (whether by mistake or not) more FMLA leave than she was entitled to, additional leave on top of that, and (eventual) reinstatement. Plaintiff's FMLA re-

taliation claim therefore fails as a matter of law.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion [Doc. # 57] for Summary Judgment is GRANTED as to all claims except Plaintiff's ADA discrimination claims (with respect to the delays in reinstatement, re-training, and delays in providing Plaintiff an ergonomic chair and grabbers) and FMLA retaliation claim (with respect to the December 2008 delay in reinstatement), for which it is DENIED.

IT IS SO ORDERED.

### Appendix I: Timeline of Events

| | |
|---|---|
| 1999 | Plaintiff hired as Lab Tech III by BI |
| 2008 | Jan. 10: Plaintiff's first back surgery<br>June 12: Letter from Watson—Plaintiff can return part-time 6/23<br>June 20: Letter from Berman seeking clarification of restrictions<br>June 26: Watson response to Berman<br>Aug. 5: Plaintiff returns to work part-time<br>Oct. 2: Plaintiff returns to full-time schedule<br>Nov. 10: Plaintiff undergoes finger surgery<br>Nov. 26: Letter from Sodha—Plaintiff cleared to use right hand<br>Dec. 4: Letter from Watson—Plaintiff's back not affected by finger surgery<br>Dec. 9: Letter from Sodha—Plaintiff can return to work 12/15 with minor restrictions on left hand<br>Dec. 17: Letter from BI—do not have enough information re: restrictions & letter from Watson–Plaintiff's back not affected by finger surgery |
| 2009 | Jan. 20: Dr. Sodha clears Plaintiff of all hand restrictions<br>Feb. 10: Plaintiff undergoes second back surgery<br>July 17: Letter from Watson—Plaintiff can return part-time light duty 7/27<br>July. 31: Letter regarding termination effective August 11<br>Aug. 6: Letter from Watson—Plaintiff can return full-time 8/10<br>Aug. 7: Plaintiff files charge with EEOC<br>Sept. 9: Letter from BI—clarification re restrictions<br>Sept. 10: Letter from Watson—reply re: clarification of restrictions<br>Oct. 09: Letter from BI—minor clarification re restrictions<br>Dec. 17: Plaintiff returns to work |
| 2010 | Feb.: Plaintiff begins retraining<br>June: Plaintiff completes retraining |